

# Missouri Court of Appeals

## Southern District

### Division Two

THE EMPIRE DISTRICT ELECTRIC COMPANY,

    Plaintiff-Respondent,

v.

DOUGLAS L. COVERDELL, and COVERDELL ENTERPRISES, INC.,

    Defendants-Appellants,

and

CITY OF BRANSON, MISSOURI,

    Defendant-Respondent,

and

ARVEST BANK, and BANK OF AMERICA, N.A., n/k/a U.S. BANK, N.A.,

    Intervenors-Respondents,

and

COMMUNITY BANK OF THE OZARKS,

    Defendant.

Nos. SD32806 and SD32807
(consolidated)

**Filed: Oct. 30, 2015**

APPEAL FROM THE CIRCUIT COURT OF TANEY COUNTY

Honorable Gerald D. McBeth, Circuit Judge

1

**REVERSED AND REMANDED WITH INSTRUCTIONS**

This opinion and our related opinion issued this same date in *U.S. Bank, N.A. v. Coverdell*, ____ S.W.3d ____, Nos. SD32844, SD32845, SD32934, SD32935, slip op. (Oct 30, 2015), address appeals by defendants Douglas L. Coverdell ("Coverdell") and Coverdell Enterprises, Inc. ("CEI"; collectively "Appellants") challenging summary judgments against them that declared Appellants have no ownership rights in portions of land abutting Roark Creek and Lake Taneycomo in the Branson Landing subdivision.[1]  This opinion addresses Appellants' appeals related to a 2003 lawsuit ("the 2003 case") filed by The Empire District Electric Company ("Empire").  Our companion *U.S. Bank* opinion addresses Appellants' appeals related to a subsequent lawsuit filed in 2011 ("the 2011 case").

**Overview**

This is the second time that the 2003 case has been before us.  Based on a rare finding of plain error in a civil case, we reversed a 2010 judgment quieting title to land in Appellants ("the 2010 judgment"), and we remanded the case.  *Empire Dist. Elec. Co. v. Coverdell*, 344 S.W.3d 842, 844 (Mo. App. S.D. 2011) (*Empire I*).  Our general remand in that opinion expressly permitted a defendant, the City of Branson ("Branson") "to amend its pleadings and [it instructed the trial court] to freely permit the amendment of pleadings of both Empire and [Appellants] should they choose to do so without prejudice to the rights of third parties to intervene in the litigation as the rules of civil procedure may provide."  *Id.* at 853.

The following claims asserted after that remand are pertinent to our review:  Empire claimed in its second amended petition ("the amended petition") that:  (1) based upon deeds,

---

[1] Any reference to "Lots" or a specific lot number, e.g., "Lot 1," in this opinion refers to lots in Branson Landing.

or alternatively adverse possession, it owned two properties which, as discussed below, we will reference as "Eastern Peninsula" and "Branson Town"; (2) Branson and two intervenor banks may have some security or other interest in these properties, and (3) the other named defendants, including Appellants, had no interest in these properties.[2]  Branson's subsequent cross-claim was phrased in terms of land within the Branson Landing development, and it alleged, based upon deeds or, alternatively, adverse possession, that Empire owned Lots 2, 3, and 6; Branson owned Lots 1 and 4; and Branson leased the lots owned by Empire.  The two intervenor banks, Arvest Bank ("Arvest") and U.S. Bank[3] (collectively "Lienholders"), separately claimed that they each held a deed of trust that secured financing for lessees -- originally $90,000,000 as to U.S. Bank's interest, and $3,956,250 as to Arvest's interest.  These interests, taken together, encumbered part of Lots 1, 3, 4, and 6.  Empire, Branson, U.S. Bank, and Arvest (collectively "Respondents") claimed that Appellants had no interest in the properties identified by Respondents.

---

[2] A hand-written legal description in an exhibit incorporated by the amended petition as the description of Property 1 is largely illegible, but a typed legal description in Empire's original petition regarding Property 1 reflected the same recorder of deeds book and page number.  And it matches -- except for some minor differences in abbreviation, capitalization, and punctuation -- the description used by Branson in its statement of uncontroverted facts and referenced by this court, *infra*, as "Eastern Peninsula."  The description incorporated for Property 2 matches the description used by Branson in its statement of uncontroverted facts and referenced by this court, *infra*, as "Branson Town."  One of the judgments discussed below (issued in response to Branson's motion for summary judgment), declares the interests in Eastern Peninsula and Branson Town held by Respondents, and it also excluded Appellants, or any one claiming through them, from having any "right, title or interest" in those properties.

[3]  The full designation for U.S. Bank in this case is "U.S. Bank, National Association, a National Banking Association, as Trustee for the Registered Holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2007 GG9, Commercial Mortgage Pass-Through Certificates, Series 2007-GG9[.]"  U.S. Bank was substituted for Bank of America after the latter's intervention.  We could not locate the order substituting U.S. Bank for Bank of America in the legal file, and the docket entries are not specific to parties in this regard.  Nonetheless, we treat the substitution as an established fact for purposes of our analysis because the trial court addressed U.S. Bank as a party in subsequent orders, and Appellants' statements of fact acknowledge that "U.S. Bank . . . asserted interests in the land" after the 2003 case was remanded.  Bank of America had asserted that its interest resulted from a merger with LaSalle Bank, N.A. ("LaSalle") and that LaSalle was an assignee and transferee of certain interests from Goldman Sachs Commercial Mortgage Capital, L.P. ("Goldman Sachs").]  For simplicity's sake, we will refer to U.S. Bank in place of Bank of America wherever a reference to Bank of America, or one of its predecessors, would have appeared in the record.

Appellants claimed that: Coverdell received "Property A" via a warranty deed, which as we understand it, may be regarded by Coverdell as overlapping part of the peninsula and an area south of the peninsula in Branson Landing; Coverdell then conveyed a smaller portion of Property A (described as "Property B") to CEI; and in the alternative, Coverdell adversely possessed both Properties A and B.

Finding merit in one of Coverdell's points, we reverse the summary judgments at issue in this opinion and remand the matter for further proceedings limited solely to Coverdell's claim that he acquired Properties A and B (as described in Appellants' answer to Empire's second amended petition and in their responses to Branson's and U.S. Bank's cross-claims ("Appellants' reasserted claims")) by adverse possession. If, on remand, that claim is found to be meritorious, the trial court is instructed to decide the extent to which such adverse possession precludes quieting title in favor of Branson and Empire as to any part of any Branson Landing lots.

**Points on Appeal**

CEI's sole point contends that "any judgment" favoring Empire, Branson, Lienholders, and a non-party CEI identifies as "HCW"[4] was "void" because "the trial court lacked authority and jurisdiction to decide this matter" in that the entities "lacked standing as parties in this case[.]"

Coverdell brings four points that claim the trial court erred: (1) "in sustaining all respondents' motions for summary judgment on grounds that Coverdell failed to timely respond because" discovery under the direction of a special master had not been completed; (2) "in rendering any judgment in this case because" it did not "permit an indispensable

---

[4] Three "HCW" entities more fully discussed, *infra*, are parties to the 2011 case: HCW Development Company L.L.C. ("HCW Development"), HCW North, L.L.C. ("HCW North") and HCW Private Development ("HCW Private").

4

party to intervene"; (3) "in dismissing Coverdell's Count I" stating "a cause of action in quiet title against Empire" when Coverdell had a general warranty deed to the property in question and Empire had failed to record a previous dismissal with prejudice of the grantor's suit against Empire and Branson "as required by section 511.320"[5]; and (4) "in dismissing Count II of Coverdell's claim" for adverse possession "because *res judicata* did not apply and" his "claim properly set out all the elements of an adverse possession claim."

Finding merit only in Coverdell's contention that his claim for adverse possession was wrongly dismissed, we reverse the following summary judgments identified by title, date, and the movant for summary judgment: (1) "**JUDGMENT**" on June 4, 2013 upon Arvest's motion ("Arvest's judgment"); (2) "**AMENDED JUDGMENT**" on June 4, 2013 upon U.S. Bank's motion ("U.S. Bank's judgment"); and (3) "**AMENDED JUDGMENT**" on June 11, 2013 upon Branson's motion ("Branson's judgment"). We will refer collectively to these judgments as "the summary judgments."[6]

---

[5] Section 511.320 is entitled "**Copy of judgment decreeing conveyance recorded--effect of failure to record**[.]" All statutory references are to RSMo 2000. Unless otherwise indicated, all rule references are to Missouri Court Rules (2015).

[6] The summary judgments each declare that it is deemed final for purposes of appeal, and we are not aware of any issue that would contradict those declarations. Disposition of an additional claim by U.S. Bank against Community Bank of the Ozarks ("Community Bank") for slander of title is not fully documented in the legal file, but such a claim would not appear to prevent the resolution of Community Bank's interests as declared in the summary judgments. Community Bank participated in this litigation (including proceedings following remand), and its interests are adjudicated in the relevant judgments here. Community Bank has not filed a brief in either of the appeals consolidated in this opinion. The following additional parties were originally included as defendants in the 2003 case: The Branson Paper Inc., a defunct corporation with Peter H. Rea as the registered agent; Julia Coverdell; B'Cuz Inc.; Keycomm, International, Inc.; Henry V. "Hank" Griffin as "Trustee under Deed of Trust"; and "[Mr.] Rea and Darlene Rea, in their capacity as Statutory Trustees of Tori, Inc[. ("Tori")]" All of these additional parties, with the exception of Mr. Rea and Mr. Griffin, were in default by the time of the 2010 judgment. *Empire I*, 344 S.W.3d at 842 and 847 n.11. It does not appear that Mr. Griffin filed any new pleading after our remand in *Empire I*. In February 2012, the trial court struck Mr. Rea's pleadings. In August 2012, Mr. Rea informed the trial court at a hearing that he had "a petition filed over 30 days ago against [Branson] in this case[,]" but the trial court indicated that it did not appear that such a pleading had been served.

**Pending Motions**

Before we proceed to an analysis of Appellants' points, we need to address multiple motions taken with the case. Coverdell asks this court to strike Lienholders as parties because they lack standing and, consistent with our analysis of standing *infra*, we deny that request.

Respondents move for a dismissal of CEI's appeal on the grounds that: CEI is not an aggrieved party, the legal file violates Rule 81.12(a)-(c), and CEI's brief violates Rule 84.04(c),(d) and (e). Branson, Arvest, and Empire all seek the dismissal of Coverdell's appeal based upon arguments that the legal file violates Rule 81.12(a)-(c) and his brief violates Rule 84.04(c) and (e).

Branson, Arvest, and U.S. Bank move to strike an affidavit executed by Terry Dody in November 2013 ("the Dody affidavit") that was included in Coverdell's appendix to his reply brief because it violates the requirements of Rules 81.12 and 84.04 governing the record on appeal. Finally, Branson and Arvest request sanctions against Coverdell ranging from dismissal of his appeal to other relief "deem[ed] just and appropriate" on the grounds that his response to the motion to strike the Dody affidavit violated Rules 55.03,[7] 84.01(a), and 84.19 by being untimely, including additional documents not contained in the record, and "misrepresent[ing] the contents of the documentation[.]"[8]

---

[7] Branson and Arvest both cite Rule "53.03" in their motions, but later in Branson's motion, Rule 55.03(c)(1) is cited. We presume that the latter rule is the intended one as there is no current "Rule 53.03." Branson emphasizes the language in Rule 55.03(c)(1) providing that an attorney is deemed to certify to the court that the attorney's written argument or contention "'is not presented or maintained for any improper purpose, *such as to harass* or cause unnecessary delay or needless increase in the cost of litigation.'" We decline to find on this record that the purpose of Coverdell's reply to Branson and Lienholders' motions to strike the Dody affidavit was to harass another party or their counsel.

[8] Rule 84.19 permits damages for "an appeal [that] is frivolous[.]" Even if we were to suppose that such damages could be awarded based solely on a reply to a motion to strike an affidavit, we would not do so here in light of the fact that one of Coverdell's points is meritorious and requires the reversal of the summary judgments. *See **Shafinia v. Nash**,* 372 S.W.3d 490, 496 (Mo. App. W.D. 2012) ("authority to assess damages

6

The various motions filed by Respondents rightly identify significant violations of Rule 84 that have made it extremely difficult for this court to analyze and resolve Appellants' error claims. Nonetheless, our preference is to decide cases on their merits whenever possible, and we choose to do so here. *See Comp & Soft, Inc. v. AT & T Corp.*, 252 S.W.3d 189, 194 (Mo. App. E.D. 2008). The Dody affidavit, however, executed after the notices of appeal were filed in July 2013, is hereby stricken as requested by Branson, Arvest, and U.S. Bank because it was not a part of the record before the trial court. *See Sleater v. Sleater*, 42 S.W.3d 821, 822 n.1 (Mo. App. E.D. 2001). Respondents' other motions are denied.

## Procedural History

All of Appellants' points challenge procedural determinations, not whether Respondents were entitled to their summary judgments as a matter of law based upon the uncontroverted material facts presented by Lienholders and Branson.[9] As a result, we relate the portions of the procedural history necessary to provide an understanding of Appellants' complaints.

Before the 2010 judgment was entered, Branson had successfully moved "to sever all the issues relating to the western half of the peninsula" located at the convergence of Roark Creek and Lake Taneycomo. A bench trial was held concerning this portion of real estate,

---

for a frivolous appeal rests within the sound discretion of this court[,]" and we may exercise discretion to deny such a motion).

[9] "A summary judgment can only be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *McLallen v. Tillman*, 386 S.W.3d 837, 839 (Mo. App. S.D. 2012). Thus, we generally review a summary judgment *de novo*, *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 452 (Mo. banc 2011), using "the same criteria as the trial court in determining whether summary judgment was proper." *Id.* We do not even reach this type of review in these cases because the points do not challenge the factual findings in one or more of the summary judgments or the application of the law to those facts. *Cf. Cosky v. Vandalia Bus Lines, Inc.*, 970 S.W.2d 861, 867 (Mo. App. S.D. 1998) (point deemed abandoned where it "merely track[ed] the standard for granting summary judgment[, was] too general to raise an issue on appeal[,]" and appellant's argument and reply brief did not cure the problem).

and Branson received a judgment in 2004 ("the 2004 judgment") that quieted title in its favor "'as to the western portion' of the peninsula[.]" *Empire I*, 344 S.W.3d at 847-48. That judgment was not appealed. *Id.* at 848. This left "the eastern portion of the property alleged in [Empire's p]etition" to be tried at a later date. *Id.* at 844, 847-48. After the 2004 judgment was entered, Empire dismissed its petition without prejudice. *Id.* at 848. That dismissal did not end the lawsuit because Appellants' claims from their "Answer and Counterclaim" remained to be decided. *Id.* For some reason not readily apparent, Branson was no longer being included in notices sent by the other parties when various pleadings were filed, and it was not an "active participant" in the 2010 jury trial on Appellants' counterclaims that resulted in the 2010 judgment. *Id.* Indeed, "[o]nly Empire and [Appellants] were active participants in this trial." *Id.*

During the 2010 trial between Empire and Appellants, Appellants' counsel made statements that the trial was about the "'east side of the peninsula[,]'" which had nothing to do with Branson's ownership claims. *Id.* at 851-52. We held in *Empire I* that these statements by Appellants' counsel "constituted judicial admissions." *Id.* at 852. "After hearing evidence and argument, the jury returned a verdict in favor of [Appellants]." *Id.* at 848. Despite the limited area of land Appellants' counsel said was at issue during the trial, the judgment that purported to implement the jury's verdict appeared to address more than just the eastern portion of the peninsula; it also "appear[ed] to include a much larger tract of real property adjacent to the south boundary of the peninsula." *Id.* at 848-49.

Branson also successfully argued in *Empire I* that "the 2010 [j]udgment divested Branson of its rights in certain property awarded to [Coverdell,]" *id.* at 850, and the erroneous judgment also possibly affected the rights of third parties. *Id.* at 852. We found

8

that the plain error that produced the 2010 judgment "affected substantial rights of Branson as party to the litigation[,]" and the nature of the error made it "impossible to determine the effect Branson's lack of active involvement in the [post-2004] litigation may have had on Empire and the way it tried its case." *Id.* at 852-53. As a result, "justice and the requirement of a fair trial for all parties require[d] the reversal of the entirety of the [2010] judgment and remand of the cause to the trial court for further proceedings." *Id.*

> Such

> [a] general remand leaves all issues not conclusively decided open for consideration at the new trial. *Butcher v. Main*, 426 S.W.2d 356, 358 (Mo. 1968). At retrial following a general remand, new evidence may be produced. *Id.* If the additional evidence introduced at the retrial presents a different case from that presented at the original trial to the appellate court, the circuit court "will be bound by the prior decision only so far as the principles of law then declared are applicable to the new state of facts." *Murphy* [*v. Barron*], 228 S.W. [492,] 495 [(Mo. 1920)]. Moreover, a mandate is controlling only as to issues addressed therein; a lower court is free to act as to other issues.

*Smith v. Brown & Williamson Tobacco Corp.*, 410 S.W.3d 623, 634 (Mo. banc 2013).

After our general remand, Arvest intervened in January 2012, based upon a December 2005 deed of trust it acquired from Solutions Bank ("Arvest deed of trust") that secured a note for $3,956,250 to be paid by HCW North. Arvest also asserted that HCW North had subleased from HCW Development certain property included within the 2010 Judgment, and it claimed that HCW Development had leased this same property from Branson. After Empire filed an amended petition in April 2012, Arvest answered, and it was then granted leave to file a cross-claim. This cross-claim sought judgment, *inter alia*, quieting title in Branson as to "all of Lot 1" and in Empire as to "all of Lot 6[,]" subject to the relevant leasehold interests of Branson, HCW Development, HCW North, and the

9

relevant lien of Arvest. The cross-claim also asked that the judgment deny any interest in these lots to Coverdell and CEI.

U.S. Bank's basis for intervention rested upon a November 2006 deed of trust executed by HCW Development and HCW Private as security for HCW Private's payment of a note for $90,000,000 ("U.S. Bank deed of trust"). U.S. Bank's subsequent answer to the amended petition included, *inter alia*, a counterclaim and cross-claim asserting that it had a substantial interest in Branson Landing property lying south of the peninsula as the holder of a leasehold deed of trust. This claim sought, among other things, that title be quieted in Branson "to all of Lots 1 and 4" and in Empire "to all of Lots 3 and 6"; that HCW Private be decreed to have a leasehold estate from Branson as to specifically described portions of Lots 1, 3, 4 and 6; that U.S. Bank have a leasehold deed of trust in the same property as that for HCW Private; and that Coverdell and CEI have no rights as to "any part of Lots 1, 3, 4 or 6[.]"

Branson's answer to the amended petition included a cross-claim seeking, among other things, quiet title in itself to all of Lots 1 and 4, and title in Empire to all of Lots 2, 3, and 6, along with a decree that Coverdell and CEI have no interest in "or right of possession to any of the Branson Landing[.]"

Also in April 2012, Appellants jointly filed a "**CLAIM TO QUIET TITLE OR, IN THE ALTERNATIVE, COUNTERCLAIM AND CROSS CLAIMS AGAINST PLAINTIFF AND OTHER DEFENDANTS**" that presented six counts. The first two are relevant to this appeal, and we will refer to them collectively as "Appellants' claims."[10]

---

[10] The transcripts and various pleadings indicate that Appellants have at times shared multiple attorneys and at other times have not done so. One of these attorneys, Charles S. Genisio, also appeared at the April 24, 2013 hearing, *infra*, "as the attorney for Kevin Checkett as the trustee[.]" Counsel for Community Bank referred to Checkett as "the bankruptcy trustee" for CEI. In quoting or summarizing material from a transcript, we will

Count I sought "[quiet] title to Property A and Property B in the name of [Coverdell] and [CEI]" based upon Appellants' deeds and alleged judicial admissions by Branson's counsel regarding title held by Coverdell's predecessor and the legal description of that property ("Coverdell's claim for quiet title"). Appellants did not specifically identify in this pleading which of its four stated separate legal descriptions of property were descriptions of properties A and B, but they eventually provided this information, as discussed *infra*.

Count II sought a declaration that Appellants "gained title to Property A and Property B . . . by adverse possession[.]" This count alleged that: (1) Appellants "and their predecessors and title [sic] have continuously occupied, repaired, maintained and improved Property A and Property B since 1907"; (2) Appellants' "possession of Property A and Property B has been hostile to the rights of all other parties in this action and under color of title"; (3) Appellants have "had actual possession" of these properties "during all the time they have occupied said property"; (4) Appellants' occupation had been "actual, open and notorious possession"; and (5) Appellants' possession had been "continuous, uninterrupted" for "more than ten (10) consecutive years."

Branson filed a motion to dismiss Appellants' claims with supporting suggestions. The suggestions asserted that Appellants' claims were based on a 1999 deed conveyed by Tori to Coverdell, but a suit by Tori[11] against Empire "claiming title to the exact same tract

_____

refer to the attorneys in accordance with the party or parties they said they represented at that particular hearing or as designated in the "appearances" portion listed at the beginning of the transcript of that hearing.
[11] The copy of a petition included with Branson's motion to dismiss as Exhibit B also included as plaintiffs Ms. Rea, as Tori's statutory trustee, and Ms. and Mr. Rea as "h/w" ("the Reas"). Appellants' response to Branson's motion, *infra*, also describes Tori's suit, quotes from it, makes no express objection to Branson's copy of the petition, and does not include a copy of the petition. We therefore rely on Branson's copy. Appellants assert in their statements of facts that "Coverdell received title to the 27 acres in 1999 from [Tori] and, subsequently[,] in 2001, deeded a 3 acre portion of this property to [CEI.]" Coverdell's May 2013 response to U.S. Bank's statement of uncontroverted facts, *infra*, admitted that the deed from W.F. and Vera H. Hoke to Tori was prepared by Mr. Rea and that Mr. Rea was the creator and incorporator of Tori. An affidavit from Mr. Rea

11

of property described by [Appellants]" in their present quiet title pleading against Empire, Branson and others" ("Tori's suit") was dismissed with prejudice in 1993 ("the 1993 dismissal"), and, consistent with Rule 67.03, *res judicata* barred the same type of claim by Tori's successor in interest against Empire. Tori's suit sought a declaration that it had the right to gift two specifically described parcels, one of which generally matched Appellants' description for Property A, to Branson. The facts pleaded as supporting such a declaration included both chain of deed transactions culminating with Tori and the assertion that Tori and its predecessors have held that parcel "in open, notorious, exclusive, continuous, adverse, hostile possession under color of title for more than 31 years next before the filing of this petition[.]" The 1993 dismissal of Tori's suit came by a hand-written docket entry that stated: "Cause dismissed w/prej. at [plaintiff's] cost. [Signature.]"

Empire also filed a motion to dismiss Appellants' claims asserting grounds similar to those raised by Branson as to Appellants' deed claim, and it additionally argued that Appellants' adverse-possession claim failed to allege sufficient facts and did not specify Properties A and B.

After a May 9, 2012 hearing in which these motions were raised, the trial court gave Appellants until May 30, 2012 to file a response "explaining why [the trial court] should not grant Branson's [and Empire's] [m]otion[s]." After the hearing, and before May 30, 2012, U.S. Bank and Arvest also filed motions to dismiss Appellants' claims, and Branson supplemented its motion to dismiss, asserting, *inter alia*, that a "'short and plain statement of facts'" concerning Appellants' claims was required under Rule 55.05. U.S. Bank's motion included a claim that Appellants' claims "fail[ed] to assert a sufficient factual basis . . .

included in Coverdell's own statement of uncontroverted material facts, *infra*, also stated that Mr. Rea had been the Hokes' "personal attorney . . . and represented them while they were attempting to sell their property[.]"

12

instead presenting only elements of a cause of action or bald conclusory allegations[,]" and its accompanying suggestions in support contended that "[c]ompletely absent from Count II is any assertion that [Appellants] ever entered, occupied, possessed, asserted control over, or even stood in remote proximity to whatever property they may be seeking to be awarded by their pleading."

On May 30, 2012, Appellants filed a response "in one pleading" to the dismissal motions filed by Branson, Empire, U.S. Bank and Arvest. This response claimed that none of the parties filing the motions to dismiss had standing, that Appellants' claims were not barred by *res judicata* as a result of the 1993 dismissal, and that "[o]nly Coverdell has presented a proper [d]eed to the [p]roperty in question." The response did not expressly assert anything regarding Appellants' Count II adverse-possession claim. The response also requested leave "to further amend [Appellants'] pleadings in [the trial court,]" but it did not address what additional information might be pleaded, and it did not incorporate any such proposed amendment. A hearing date for argument on the motions to dismiss was set for July 19, 2012, but that hearing was subsequently cancelled after Branson filed a reply objecting to further argument.

On June 8, 2012, the trial court entered an order sustaining Branson's motion and dismissing Appellants' claims with prejudice that did not detail the reasoning of the trial court ("the June 2012 order"). The trial court subsequently granted Lienholders' motions to dismiss Appellants' claims, and the dismissal granted in response to U.S. Bank's motion was also denoted as having been granted "with prejudice." In August 2012, Appellants' reasserted claims were presented in their answer to the amended petition and in responses to

13

Branson's and U.S. Bank's cross-claims.  This time, specific legal descriptions for Properties A and B were included.[12]

At a hearing in August 2012, Community Bank's counsel argued for reconsideration of the dismissal of Appellants' claims, adding that if the 1993 dismissal of Tori's suit was considered a judgment, then it had to be recorded within eight months in order to be valid, citing section 511.320.  Following this argument, Appellants' counsel stated that he "want[ed] to [state] on the record that we obviously agree one hundred percent and advance the same argument."  In September 2012, the trial court dismissed Appellants' claims again, and its order indicated:  Appellants' claims had already been dismissed; they were filed out of time and without leave of court; and they were barred by *res judicata*.

In October 2012, Branson filed its motion for summary judgment on its cross-claim for quiet title and against Appellants on their "Amended Claim[s]" concerning a "'breach of contract' claim and a fraud claim."[13]  Branson also filed a statement of uncontroverted material facts ("Branson's uncontroverted facts") with its motion and accompanying suggestions in support.  Branson's uncontroverted facts purported to incorporate at least 25 exhibits (not counting exhibits within exhibits) that included, *inter alia*, deeds, affidavits, judgments, plats, leases, requests for admissions, a map, and a promissory note.

---

[12] The legal descriptions for Properties A and B are reproduced from Appellants' answer to the amended petition in the appendix to this opinion ("the Appendix").  This reproduction and the others in the Appendix are cropped images of the relevant portions of the cited documents, or exhibits incorporated into those documents, and they retain the original fonts, formatting, and text from those materials as they appeared in the legal file.

[13] The docket sheet indicates that Appellants filed an "Amended Claim for Breach of Contract or in the Alternative, Motion to Enforce Settlement" on September 20, 2012 and another pleading entitled the same as this one, save the punctuation, on September 24, 2012.  We have been unable to locate either of these pleadings in the legal file.  Branson moved for dismissal of Appellants' September 20, 2012 pleading, asserting that Appellants' claims against it for breach of contract and fraud related to the 2004 judgment were untimely and failed to state claims upon which relief could be granted.  Appellants' additional claims for breach of contract/enforcement of settlement were also dismissed by the trial court.

14

Branson's uncontroverted facts included that, based on a series of described transactions, title to land specifically described therein concerning a tract referred to as "the 'Eastern Peninsula'" ("Eastern Peninsula") was held by Empire. Land specifically described in Branson's uncontroverted facts and referred to as "the 'Branson Town Deed Tract'"[14] ("Branson Town") was also asserted to be held by Empire by deed. Branson stated that it had leased Eastern Peninsula and Branson Town from Empire, "since at least 1937[,]" the lease was renewed in 2004, and this land was used and possessed exclusively by Branson as a park "for more than thirty (30) years prior to commencement of the Branson Landing Development[.]" Additionally, Branson claimed it was an uncontroverted fact that "no person or entity other than [Branson] has been observed exercising any possession, right, title, interest or control over" this park and Appellants "have judicially admitted that since at least 1937 Branson has been in possession of the property described in the 1937 and 2004 leases from Empire."

Branson also asserted as uncontroverted facts that the 2004 judgment quieted title in Branson to specifically described land referred to as the "the 'Western Peninsula'" ("Western Peninsula") and that Branson also owned land specifically described and also referred to as "[B]lock[s] 3, 4, and 5 of Park Addition" ("Park Addition") based upon a series of described transactions. Branson's asserted uncontroverted facts additionally included that "[i]n 2004, the entire Peninsula, [Branson Town] and Park Addition were replatted and renamed Branson Landing Subdivision, [Western Peninsula and Park Addition] being Lot 1 and

---

[14] In this same document, the label "Branson Town Company Tract" is also used. Without so holding, it appears that the label "Branson Town Deed Tract" and label "Branson Town Company Tract" may refer to the same piece of land; the distinction has not been raised as an issue on appeal, and we will use "Branson Town" as our reference for both labels.

owned in fee by Branson, and [Eastern Peninsula and Branson Town] being Lot 2 and Lot 6 and owned in fee by Empire[.]"[15]

In November 2012, U.S. Bank filed its motion for summary judgment on Count I of its counterclaim and cross-claim for quiet title. U.S. Bank also filed a statement of uncontroverted material facts ("U.S. Bank's uncontroverted facts") with its motion and supporting suggestions. Those asserted facts purported to incorporate by reference 11 exhibits, including *inter alia*, judgments and deeds that had also been filed in the 2011 Case. U.S. Bank described the property at issue in its motion as "being part of Lots 1, 3 and 4 . . ., less certain excepted tracts, together with Tracts B-1 and B-2 of Lot 6 . . . as is more particularly described in the Retail Property Description incorporated herein by reference as '**Exhibit A**'" ("Retail Tract").[16]

U.S. Bank's uncontroverted facts included that Appellants' claims asserted adverse possession "to land lying both South of the Base of the Peninsula and on the Eastern [h]alf of the Peninsula" and that such claims had been dismissed with prejudice.

In December 2012, the trial court entered a scheduling order ("scheduling order") directing that any additional motions for summary judgment be filed "on or before February 28, 2013[.]" The parties were given "until March 28, 2013, to respond to the [m]otions for [s]ummary [j]udgment[,]" and "[a]ll [r]eplies in [s]upport of [m]otions for [s]ummary [j]udgment [were] due on [or] before April 15, 2013."

The following month, the trial court granted Branson's motion for the appointment of a special master. The order provided that the special master was "to rule on any discovery disputes or objections or attend any depositions . . . and to report any rulings to" the trial

---

[15] The legal descriptions for Eastern Peninsula, Branson Town, Western Peninsula, and Park Addition from Branson's uncontroverted facts are reproduced in the Appendix.
[16] The legal description for Retail Tract from U.S. Bank's uncontroverted facts is reproduced in the Appendix.

court. An amended order was issued in February 2013 that broadened the special master's duties to also include making recommended rulings "on all pre-trial motions, including, but not limited to dispositive motions and motions for summary judgment[.]" Later that month, Coverdell moved to vacate the scheduling order.

On March 1, 2013, Arvest filed its motion for summary judgment on its cross-claim with its included statement of uncontroverted material facts ("Arvest's uncontroverted facts"). Those asserted facts included that Appellants did not have "any right, title or interest in any part of Lot 1[.]" Further, two specifically described pieces of land in the northwest part of Lot 1, "'HCW North-1'" and "'HCW North-2'" (collectively "Northwest Tracts"), were stated as being leased by "HCW," subleased by HCW North, and encumbered by Arvest's deed of trust.[17] Arvest's uncontroverted facts drew upon twelve exhibits, including, *inter alia*, affidavits, a sublease, a deed of trust, and an assignment, as well as other exhibits referenced in U.S. Bank's statement of uncontroverted facts.

On March 5, 2013, Coverdell filed a supplement to his motion to vacate the scheduling order that informed the trial court "of two recently discovered lawsuits, one in St. Louis County, styled *HCW Development Co., LLC v. Tri-Lakes Title & Escrow, LLC, et al.*, . . . and the other in the United States District Court for the Western District of Missouri[,] Southern Division, styled *City of Branson v. First American Title Insurance Company, et. al*[.]" He asserted that "these lawsuits contain material information which is not only relevant to the issues currently pending before [the trial court], but they also provide an additional justification for the discovery which Coverdell has been attempting to conduct, including the taking of multiple depositions."

---

[17] The legal descriptions for Northwest Tracts from Arvest's uncontroverted facts are reproduced in the Appendix.

17

On March 8, 2013, counsel for the parties in both the 2003 case and the 2011 case appeared before the special master. In the course of addressing discovery issues, counsel for U.S. Bank stated that responses to summary judgment motions were due on March 28, 2013 under the existing scheduling order. The special master stated, "I don't think the March 28th date's going to make it, and that's partially my fault because I kind of told everybody to put things on hold until we could get together and talk about it."

After counsel for some of the parties addressed their concerns, the special master stated that a deadline would be made for any summary judgment motions to be filed on June 3, 2013. After additional discussion, the special master stated a deadline for responses to such motions as July 1, 2013, and that two weeks thereafter would be permitted for filing a sur-reply. Another proceeding before the special master was set for March 26, 2013, but no transcript of any such proceeding has been included in the record on appeal.

On April 5, 2013, Coverdell filed a motion for an extension of time to respond to Arvest's summary judgment motion which asserted that his "response [was] due April 3, 2013." Coverdell indicated that his reasons included a desire to conduct additional discovery, but he made no reference to the dates that the special master announced would govern the timing of summary judgment motions and responses thereto.

The special master's report and recommendations filed on April 9, 2013 did not contain any filing deadlines for summary judgment motions and responses, and it did not contain any recommended ruling on Coverdell's supplemented motion for the scheduling order to be vacated or his motion for an extension of time to respond to Arvest's summary judgment motion. No party cites to any other written order in the record that would reflect the dates mentioned by the special master on March 8, 2013 or that contains any different

18

dates related to the summary judgment motions. And while Coverdell filed objections to the special master's recommendations, he did not include any challenge to the deadlines announced by the special master for the filing of summary judgment motions and responses thereto.

At a hearing before the trial court on April 24, 2013, Appellants' counsel objected to the taking up of any "substantive motions[,]" stating that his "client [sic]" relied on what the special master said in March 2013 about "a new scheduling order." Appellants' counsel understood that the parties were "going to have the discovery done before we take up any dispositive motions" and depositions were to be "all done, then, by June 3rd." Counsel for the bankruptcy trustee argued that his "client" had relied on "things . . . as a result of the [s]pecial [m]aster" and wanted "time to respond to those motions."

The trial court announced that a hearing would be held on May 29, 2013, and the following exchange occurred:

| | |
|---|---|
| [Branson's counsel]: | What are we going to do on the 29th? |
| THE COURT: | I'm going to rule. |
| [Branson's counsel]: | You're going to what? |
| THE COURT: | I'm going to rule on the motions for summary judgment. |
| [Branson's counsel]: | We're not going to have any more argument? |
| THE COURT: | I'll listen to people. |
| [Branson's counsel]: | You're not granting any extension? Okay. |
| [Appellants' additional counsel]: | Judge, just so I'm clear, we can't file anything, then? |

19

THE COURT:                          I guess you could file a response, but --

[Attorneys for Coverdell, U.S. Bank, Branson, Arvest then argue whether additional responses should be allowed.]

[Appellants' additional counsel]:   It seems to me there's enough confusion with [the special master] getting involved, and out, and all the rest of it, that you ought to at least take some papers. If you want to put them at the bottom of the birdcage --

THE COURT:                          Okay.

[Appellants' counsel]:              That went on the bottom.

[Appellants' additional counsel]:   -- that's okay, too, but we would request the opportunity to file something prior to that hearing.

[Appellants' counsel]:              And, Judge, we can do it by May 20th. If they need to respond, they have the time to respond.

[Branson's additional counsel]:     Judge --

[Appellants' counsel]:              Judge, for my client, Your Honor, I relied upon [the special master], I truly did, and if a response had to be done the 28th, you know, without -- and he said without discovery, we would have done that. So all we're asking is -- we'll file a response. That's all. We can do it by May 20th.

[Attorneys for U.S. Bank, Coverdell, and Branson then argued whether the special master could be relied upon for a change in the scheduling order.]

THE COURT:                          I will tell you this: I will be here on the 29th. I will listen to anybody that has anything to say and then I will rule.

[Branson's additional counsel]:     Okay.

[Branson's counsel]:                Okay.

20

THE COURT: And I'm not saying you can or cannot file. That's a -- I'm just going to leave it like that. These matters will be ruled on on the 29th of May.

Between that day and Appellants' self-imposed deadline of May 20, 2013, no responses to the summary judgment motions were filed. On May 21, 2013, the day after that deadline had expired, Coverdell filed several pleadings, including his own statement of uncontroverted material facts and responses to Arvest, Branson, and U.S. Bank's uncontroverted facts. Each of Coverdell's responses included a section entitled "**GENERAL RESPONSE**," which asserted that the summary judgment motion at issue was "entirely improper and untimely" based upon various events in the litigation. Coverdell did not specifically assert in these pleadings that Arvest's summary judgment motion was filed after the time permitted by the scheduling order.

Coverdell also filed a "**MOTION FOR LEAVE FOR ADDITIONAL TIME TO RESPOND TO SUMMARY JUDGMENTS AND TO CONDUCT DISCOVERY**" ("motion for additional time") in which Coverdell argued that he had been denied the discovery necessary to respond to the summary judgment motions. This motion did not address statements by Coverdell's counsel at the April 24th hearing that responses could be filed by May 20, 2013. Further, it did not allege that any of the other summary judgment motions were untimely filed. CEI did not file a response to Respondents' summary judgment motions before the May 29, 2013 hearing.

At the May 29th hearing, Appellants' attorneys did not argue the merits of Coverdell's responses to Respondents' summary judgment motions. Appellants' additional counsel began the record of this hearing as follows:

21

| | |
|---|---|
| [Appellants' additional counsel]: | If we could go on the record for a second. It might be helpful from our side to figure out exactly what you think the parameters of this are so that we can either shorten it or not shorten it. Would that be fair? |
| THE COURT: | Yes. |
| [Appellants' additional counsel]: | So let me -- so just reading last time's transcript, a couple of things I think would help. |
| | First is, I was of the view that you were ready to rule the summary judgments based on the failure of this group to file 30-day responses. |
| | If that's the case, we don't have to go through any of that, if you're going to just -- all of this if you're going to make a procedural ruling. And we've been able to put what we need to put in the record for that purpose for appeal if that happens. |
| | The second thing is, if I read it again, you think we were only dealing -- and you were nodding when I said that, so the second thing is you think that we're only dealing with the 3 [acre] piece today. |
| THE COURT: | I think that's right, yes. |
| [Appellants' additional counsel]: | Okay. So we're only going to deal with the 3 acres, and you can announce whether or not you want to rule these summary judgments on the procedural thing. |

Counsel for the parties then addressed the trial court concerning whether one or more summary judgments would be limited to "the 3 acres" comprising "the eastern side of the peninsula" or would include additional acreage. The trial court indicated that the summary

22

judgments would address the additional acreage. As counsel for the parties also addressed their views on the entry of separate judgments or a combined one, Appellants' additional counsel stated that he "want[ed] to make sure that [the trial court was] entering it [sic] on procedural grounds and not substantive grounds[,]" and the trial court stated, "That's correct." Counsel for Branson questioned what was "meant by the term procedural versus substantive judgments." Appellants' additional counsel indicated that the basis for granting the summary judgments rested on the failure to respond to those motions, and he did not raise Coverdell's pleadings that had been filed on May 21, 2013, one day later than Coverdell's self-imposed deadline of May 20th. The trial court eventually indicated that the basis for its findings, at least as to Branson's summary judgment, was "the failure to respond[.]"

The trial court then entered a series of separate orders filed on May 29, 2013, including orders denying Coverdell's motion for additional time, striking and denying Coverdell's "Motion for Additional Summary Judgment[,]" and finding "that all facts are judicially admitted by failure to timely respond to assorted facts in Summary Judgment motions. This is to all pending Summary Judgment motions."

On June 4, 2013, Arvest's judgment[18] was entered on its cross-claim. It stated that Appellants "did not file a timely response to [Arvest's] Motion for Summary Judgment . . . and all of the facts listed in [Arvest's uncontroverted facts] have been admitted by [Appellants.]" This judgment quieted title in Branson concerning Northwest Tracts.[19]

---

[18] We presume Arvest's judgment is an amended judgment even though it was not so denominated. It followed another "**JUDGMENT**" entered on May 31, 2013 that also granted Arvest summary judgment motion on its cross-claim, and the two judgments are nearly identical. One significant difference is that the earlier judgment, instead of quieting title in Branson, quieted title "in the City of Springfield, Missouri[.]"

[19] We do not hold that the legal descriptions in Arvest's judgment match those set forth in Arvest's summary judgment motion, but for the convenience of the reader, we retain the same labels of parcels that appear similar so that the legal description for Northwest Tracts in Exhibit A to Arvest's judgment is set forth in the Appendix

Arvest's judgment stated that the property described originally in Empire's petition and Appellants' counterclaim "was all re-platted as a portion of Lot 1 and Lots 2 and 6," and it stated that the final re-plat of this subdivision was recorded in February 2004. The judgment declared that Northwest Tracts "[lie] south of the Base of the Peninsula[,]" and the chain of title conveying it to Branson "is unbroken and does not include [Appellants] or any other party through which [Appellants] may claim title to any part of [Northwest Tracts.]" It also noted that the 2004 judgment "quieting title to the western portion of the peninsula" to Branson had not been appealed and was final. Arvest's judgment further declared the following: Branson and HCW Development "entered into a Master Lease" that "included all of Lot 1" in October 2003; in July 2005, HCW Development "entered into a Sublease with [HCW North]" as to the Northwest Tracts; in December 2005, HCW North executed "[Arvest's deed of trust] to secure a Promissory Note in the maximum amount of $3,956,250.00, which encumbered the sub-leasehold of [Northwest Tracts]"; and Arvest's deed of trust was recorded in January 2006.

Arvest's judgment declared that Branson's title was "subject to the valid and enforceable leasehold interest of [HCW Development], the valid and enforceable sub-leasehold interest of [HCW North], and the first priority lien in and to said sub-leasehold interest created by [Arvest's deed of trust.]" Arvest's judgment further declared that neither Coverdell, CEI, "nor any others claiming by through [sic] or under them, have any right, title or interest in and to, or right of possession of, any of [Northwest Tracts]." The judgment also "dissolved" all lis pendens related to Northwest Tracts.

as "Arvest's Judgment - Northwest Tracts." The judgment also incorporated an "Exhibit B" as a depiction of the subject land. A document clearly marked "Exhibit B" is not included with Arvest's judgment in the legal file, but what appears to be a small part of a map, and therefore perhaps Exhibit B, was visible on the bottom of the second page of the exhibits. The visible portion is so incomplete as to be worthless.

24

That same day, U.S. Bank's judgment was granted "as to Count I of its Counterclaims and Cross-Claims" concerning "the property described on "Exhibit A" attached hereto and as depicted on "Exhibit B" attached hereto [("Retail North").]"[20] Findings and conclusions in U.S. Bank's judgment included: "Coverdell did not file a timely response to U.S. Bank's Motion for Summary Judgment[, and] . . . . [CEI] filed no response at all"; Appellants' "claims for adverse possession have been dismissed with prejudice"; U.S. Bank had "demonstrated an unbroken, record chain of title to [Retail North]"; Branson was the fee simple owner in that part of Lot 1 located in Retail North; Empire was the fee simple owner of that part of Lot 6 located in Retail North; HCW Private had an enforceable lease for Retail North and it was the borrower for U.S. Bank's deed of trust; Appellants' claims to record title rested in a deed executed by one of its predecessors that included land that the predecessors "could not have transferred or conveyed" because it had not been conveyed to them by their own predecessors and "neither [Coverdell nor CEI] has demonstrated any actual possession as required for adverse possession[,]" and Appellants had not shown any "present ability to control the land or any intention to exclude others from the land they do not control."

The decree in U.S. Bank's judgment did not expressly quiet title for Retail North. Instead, it declared that U.S. Bank's deed of trust was valid and a "first priority"

_____

[20] Without so holding, we observe that the legal description for Retail North begins differently than that for Retail Tract in U.S. Bank's uncontroverted facts as Retail North purports to limit the parcel to "[a]ll of that part of the following property that is situated within the Northeast Quarter of the Southwest Quarter of Section 33, Township 23 North, Range 21 West, in Taney County, Missouri[.]" Exhibit B to U.S. Bank's judgment, a map, depicts land with a portion outlined with a bold black line which is restricted to portions of Lots 1 and 6 south of the base of the peninsula and within the "NE 1/4 SW 1/4[.]" The legal description and map concerning Retail North are reproduced in the Appendix under the heading "U.S. Bank's Judgment - Retail North." One of the findings in U.S. Bank's judgment is that the property at issue in the judgment "is situated entirely in the Northeast [Q]uarter of the Southwest [Q]uarter of Section 33, Township 23 North, Range 21 West, in Taney County[.]" We therefore presume, without so holding, that U.S. Bank's judgment only affects the portions of the Lots specifically described that are also within the Northeast Quarter of the Southwest Quarter of Section 33, Township 23 North, Range 21 West in Taney County.

25

encumbrance on Retail North. The judgment denied Appellants and "others claiming by or through them" "any right, title or interest, in and to, or right of possession of, [Retail North,]" and it dissolved any lis pendens filed by Coverdell or CEI concerning this property.

On June 11, 2013, Branson's judgment was entered. This judgment addressed Branson's summary judgment motion, but it also declared that the trial court had entered "prior orders dismissing the claims of [Appellants] based on *res judicata*, [and noted] the [trial c]ourt's April 24, 2013 Judgment dismissing [Appellants'] claims with prejudice[.]" Branson's judgment stated that Appellants did not "timely or properly" respond to Branson's summary judgment motion or its uncontroverted facts and "the material facts are undisputed." Branson's judgment quieted title in Empire as to the "portions of Lot 2 of the Replat of Branson Landing" specifically described and referred to as "the Eastern Peninsula'" -- Eastern Peninsula -- and to land described as the "Branson Town Company Tract" -- Branson Town -- with a further declaration that "Branson has a valid and enforceable lease" as to these tracts.[21] The judgment also quieted title in Branson to all of Lot 1, including land formerly known as "The Western Peninsula" --Western Peninsula -- and "Blocks 3, 4 and 5 of Park Addition" -- Park Addition.

Branson's judgment declared that Coverdell, CEI, and those claiming

by or through them, have no right, title or interest, in and to, or right of possession of, or any part of the real property described herein as Western Peninsula, Eastern Peninsula, Park Addition [and Branson Town] now known as Lots 1, 2 and 6 of the Re-plat [sic] of the Branson Landing Subdivision[.]

---

[21] We do not hold that the legal descriptions in Branson's judgment match those set forth in Branson's uncontroverted facts, but for the convenience of the reader, we retain the same labels of parcels that appear similar so that the legal descriptions in Branson's judgment for Eastern Peninsula, Western Peninsula, Park Addition and Branson Town are set forth in the Appendix under the heading "Branson's Judgment" and the specific parcel's name.

As a predicate to these decrees, Branson's judgment stated that the 2004 judgment had quieted title in Branson as to property described as "the 'Western Peninsula[,]'" that Appellants had not "used, occupied, obstructed, or controlled" Western Peninsula, and Appellants "do not appear in the record chain of title" for that property. Branson and Empire's respective chains of title for Western Peninsula, Eastern Peninsula, Park Addition, and Branson Town were also set forth in Branson's judgment, and it described the re-platting of these properties as Branson Landing.

Branson's judgment also declared that Branson had leased Eastern Peninsula under 99-year recorded leases with Empire in 1937 and 2004, and it had been used as a park by Branson "for more than thirty (30) years prior to commencement of the Branson Landing Development[.]" Although it noted a chain of record that "arguably includes [Eastern] Peninsula and other lands" in warranty deeds granted to Appellants, it declared that their predecessor in title "had no record title in [Eastern] Peninsula" at the pertinent time and that under the "leases and for more than thirty (30) years prior to 2002 . . . . no person or entity other than [Branson] has been observed exercising any possession, right, title, interest or control over" this park. Likewise, Appellants and their predecessors in title were expressly found not to have been in possession of "any part of [Park] Addition during any time prior to the last ten years prior to 2003 or since" or any part of Branson Town that was operated as a park by Branson.

Appellants' notices of appeal were timely filed, and Coverdell's notice specifically referenced Branson's judgment.

**Analysis**

*Standing*

Both Appellants present issues that they describe as a lack of standing, but they differ as to their method of presentation (a point relied on versus a motion), and the scope of their claims is different. As best we understand CEI's claim, it focuses on behavior of Respondents and "HCW" that occurred before the 2010 Judgment was entered. Coverdell focuses on Lienholders' connection with the basis of the litigation.

It is helpful to remember that "[a] party has standing to sue when it has an interest in the subject matter of the suit that gives it a right to recovery, if validated." ***Portfolio Recovery Assocs., LLC v. Schultz***, 449 S.W.3d 427, 434 (Mo. App. E.D. 2014). "Lack of standing cannot be waived and may be considered by the court sua sponte." ***Bellistri v. Ocwen Loan Servicing, LLC***, 284 S.W.3d 619, 622 (Mo. App. E.D. 2009).

> Although sometimes referred to in terms of jurisdiction, . . . the concept of standing is better understood as a matter of justiciability, that is, of a court's authority to address a particular issue when the party suing has no justiciable interest in the subject matter of the action. For this reason, Missouri courts before and after the decision in *J.C.W. ex rel. Webb v. Wyciskalla*, 275 S.W.3d 249 (Mo. banc 2009), have held that standing is a prerequisite to the court's authority to address substantive issues and so must be addressed before all other issues. *See, e.g., CACH*, [*LLC v. Askew*,] 358 S.W.3d [58,] 61 [(Mo. banc 2012)] (reaffirming that "[c]ourts have a duty to determine if a party has standing prior to addressing the substantive issues of the case.").

***Schweich v. Nixon***, 408 S.W.3d 769, 774 n.5 (Mo. banc 2013).

We review standing questions *de novo*, ***LeBeau v. Comm'rs of Franklin Cnty., Mo.***, 422 S.W.3d 284, 288 (Mo. banc 2014), and we determine whether the necessary standing exists based upon the petition and any other undisputed facts. ***Stander v. Szabados***, 407 S.W.3d 73, 78 (Mo. App. W.D. 2013).

28

*1. CEI's Point Challenging Respondents' Standing*

CEI challenges the standing of all Respondents and one non-party, "HCW," in its sole point relied on. The point reads:

> The Trial Court erred in rendering any judgment in this case in favor of Empire, Branson, HWC, [sic] U.S. Bank and Arvest because the trial court lacked authority and jurisdiction to decide this matter in that Empire, Branson, HCW, U.S. Bank and Arvest lacked standing as parties in this case and therefore the judgment is void.

Rule 84.04(d)(1) requires that a point "be in substantially the following form: "The trial court erred in [*identify the challenged ruling or action*], because [*state the legal reasons for the claim of reversible error*], in that [*explain why the legal reasons, in the context of the case, support the claim of reversible error*].'" CEI's point does not specify the particular ruling or rulings that it challenges. "A point relied on which cannot be comprehended without referring to other portions of the brief preserves nothing for review." **Carden v. Mo. Intergovernmental Risk Mgmt. Ass'n**, 258 S.W.3d 547, 556 (Mo. App. S.D. 2008). The problem is especially acute here because although the argument supporting the point generally references judgments in favor of U.S. Bank and Arvest and states that "all judgments entered in favor of Respondents should be declared void[,]" CEI's theory of error regarding Lienholders appears to differ from the one applied to Branson and Empire.

And while those theories repeatedly refer to the term "standing" -- and what must happen if there is no standing -- none of CEI's arguments articulate an understandable explanation of or test for standing that is supported by citations to authority and is then linked to a claimed shortcoming that would apply to Lienholders or to Branson and Empire. As a result, even after considering the supporting argument, we cannot address CEI's multifarious point without improperly becoming its advocate. *See* **Thummel v. King**, 570

S.W.2d 679, 686 (Mo. banc 1978) ("It is not the function of the appellate court to serve as advocate for any party to an appeal. That is the function of counsel. It would be unfair to the parties if it were otherwise").

CEI's fatally defective point, which is not cured by the argument that follows it, preserves nothing for appellate review, and it is denied for that reason.[22]

*2. Coverdell's Motion to Strike Lienholders as Parties*

Coverdell's challenge to Lienholders' standing is presented in a motion to strike filed after he filed his brief. The motion asserts that Lienholders do not have title to the real estate; their interest is not a "beneficial" one; they are not seeking title; "Rule 52.01 requires that the real party in interest prosecute a civil action"; and Lienholders cannot "meddle" in this case because they were not entitled to intervene as a matter of right under Rule 52.12(a)(2) especially since Empire and Branson protect Lienholders' interests. Coverdell contends that because Lienholders lacked standing, the trial court "erred in permitting their intervention" and was without authority to enter any judgments in their favor.

We cannot review Coverdell's arguments that Lienholders did not satisfy the requirements of rules 52.01 and 52.12(a)(2). Although Rule 52.01's provision for the name in which a suit must be brought is closely related to standing, *see **S & P Props., Inc. v. Daly***, 330 S.W.3d 128, 131 (Mo. App. E.D. 2010), a challenge to the real party in interest under Rule 52.01 must be raised in the trial court and presented in a point relied on in order to be preserved for appellate review. *See **State Farm Mut. Auto. Ins. Co. v. Jessee***, 523 S.W.2d 832, 834 (Mo. App. K.C.D. 1975) (an argument going to "whether plaintiff is the real party

---

[22] In its argument supporting its point, CEI also states that it "fully adopts and incorporates by reference all of the arguments made in the separate brief of [Coverdell]. They have not been repeated here to relieve the Court of the burden of reading duplicate arguments." Not only does CEI fail to set forth specific additional points for us to review, but it offers no analysis of how Coverdell's own points are applicable to it. Again, we will not advocate for CEI, *see **Thummel***, 570 S.W.2d at 686, and make such comparisons for it.

in interest under Rule 52.01" or whether plaintiff has the capacity to sue under Rule 55.13 must be preserved below and presented in a point relied on).

We also refuse to review Coverdell's claim that Lienholders did not satisfy the requirements of Rule 52.12(a)(2) because it was not raised in a point relied on. *Cf. Pearman v. Dep't of Soc. Servs.*, 48 S.W.3d 54, 55 (Mo. App. W.D. 2001) (errors raised only in argument and in an altered point in a reply brief were not preserved for review). Intervention as of right under Rule 52.12(c) is typically accomplished via "simple motion practice" using the procedure set forth in the rule. *Allred v. Carnahan*, 372 S.W.3d 477, 481 (Mo. App. W.D. 2012) (reviewing the denial of a motion to intervene). Coverdell cites no authority that would allow an appellant to object to an intervention under Rule 52.12(a)(2) after the appellant's brief has been filed.

A true objection to standing however, cannot be waived. *Bellistri*, 284 S.W.3d at 622. Standing requires: "1) a justiciable controversy between the parties; 2) the petitioner has a legally protectable interest at stake, and 3) the question posed is appropriate and ripe for judicial resolution." *Farmers Ins. Co. v. Miller*, 926 S.W.2d 104, 106 (Mo. App. E.D. 1996). Although Coverdell recites each of these elements, his argument relies solely on a challenge to the existence of the second element -- that U.S. Bank and Arvest lack a legally protectable interest under section 527.150.1.

Section 527.150 provides:

1. Any person *claiming any title, estate or interest in real property*, whether the same be legal or equitable, certain or contingent, present or in reversion, or remainder, whether in possession or not, may *institute* an action against any person or persons having or claiming to have any title, estate or interest in such property, whether in possession or not, to ascertain and determine the estate, title and interest of said parties, respectively, in such real estate, and to define and adjudge by its judgment or decree the title, estate and interest of the parties severally in and to such

real property.

2. And upon the trial of such cause, if same be asked for in the pleadings of either party, the court may hear and finally determine any and all rights, claims, interest, liens and demands, whatsoever of the parties, or of any one of them, concerning or affecting said real property, and may award full and complete relief, whether legal or equitable, to the several parties, and to each of them, as fully and with the same force and effect as the court might or could in any other or different action brought by the parties, or any one of them, to enforce any such right, claim, interest, lien or demand, and the judgment or decree of the court when so rendered shall be as effectual between the parties thereto as if rendered in any other, different or separate action prosecuted therefor.

(Emphasis added.)

Arvest pleaded "an interest" in the property at issue as the lawful holder of a promissory note secured by part of Lot 1, which Branson owned in fee simple, and asked that title be quieted in this property, subject to the leasehold interest of HCW Development and HCW North. U.S. Bank pleaded that it had a substantial interest in Branson Landing property lying south of the peninsula as the holder of a leasehold deed of trust encumbering that property, and it asked the trial court to quiet title in Branson as to Lots 1 and 4 and in Empire as to Lots 3 and 6, along with a request for a declaration that U.S. Bank's deed of trust was valid.

Coverdell addresses Lienholders separately,[23] but he generally argues that each lacks a sufficient "interest" to bring a quiet title claim, relying on a discussion in *R. L. Sweet Lumber Co. v. E. L. Lane, Inc.,* 513 S.W.2d 365, 368 (Mo. banc 1974), concerning the

---

[23] Coverdell also alleges differences in the nature of Lienholders' interests, insisting that "U.S. Bank is nothing more than a trustee of a Deed of Trust for the current note holders, Greenwich Capital[,]" while Arvest "is . . . the holder of a note secured by a deed of trust." U.S. Bank's suggestions opposing Coverdell's motion point out that it was the trustee for the holder of the deed of trust, not the trustee for the deed. Further, U.S. Bank's uncontroverted facts included tracing HCW Development and HCW Private's delivery of the U.S. Bank deed of trust to secure the $90,000,000 note through assignees as trustees for Greenwich Capital up to its own assignment as trustee for Greenwich Capital, and U.S. Bank's judgment recited its role as Greenwich Capital's trustee. Given our discussion, *infra*, of Coverdell's failure to properly contest U.S. Bank's uncontroverted facts, we must reject Coverdell's allegation that U.S. Bank was just a trustee on a deed instead of a trustee for the holder of the deed.

interest created by a deed of trust. The Court stated there that a deed of trust is "'neither an estate in land, nor a right to any beneficial interest therein[,]'" but simply establishes "'the right to have the debt, if not otherwise paid, satisfied out of the land.'" *Id.* The issue in the case was whether "mortgagees and [a] title company[,]" *id.* at 366, were entitled to "the 10 day notice of intentions to file liens which may be gleaned from the mechanics' lien statutes." *Id.* at 370. Coverdell also offers the statement in ***Deer Run Prop. Owners Ass'n v. Bedell***, 52 S.W.3d 14, 18-19 (Mo. App. S.D. 2001), that no authority had been cited by the appellants that "the holders of deeds of trust or mortgages have an ownership interest in the land." That case involved a claim "for past due land assessments" against landowners in a subdivision, *id.* at 16, and the landowners claimed that summary judgment against them was improper because, *inter alia*, they had alleged that "loans and deeds of trust" encumbered the land when the indenture giving rise to the assessments was created. *Id.* at 18.

U.S. Bank and Arvest cite ***Anheuser-Busch Emps.' Credit Union v. Davis***, 899 S.W.2d 868, 869 (Mo. banc 1995), where a lienholder's constitutionally protected property interest in the real estate required notice of a tax sale before the interest was extinguished.[24] No party, however, points us to any case that has decided whether a lien is an "interest" sufficient to instigate an action under section 527.150.1.[25] In ***Dysart v. State Dep't of Pub. Health & Welfare***, this court stated, "'For some purposes and within the meaning of certain statutes, a lien is not classified as an interest in land.'" 361 S.W.2d 347, 353 (Mo. App.

---

[24] *See also* **Collector of Revenue, by and through the Director of Collections for Jackson County, Mo.**, 453 S.W.3d 746, 748 (Mo. banc 2015) (finding that a "mechanic's lien properly filed with the clerk of the court constitutes a substantial property interest that is entitled to due process protection").

[25] Because there is no conclusive, controlling Missouri authority, we would typically look to persuasive authority from other jurisdictions. *Cf.* **Whitehorn v. Dickerson**, 419 S.W.2d 713, 718 (Mo. App. Spfld.D. 1967). On this particular issue, however, the technique is of limited utility as other jurisdictions are divided on the question of whether a lienholder may maintain a quiet title action, and none of the decisions we reviewed are based on a statute substantially similar to section 527.150. *See* 65 AM. JUR. 2D *Quieting Title* § 41 (2011).

Spfld.D. 1962) (quoting ***Bankers Home Bldg. & Loan Ass'n v. Wyatt***, 162 S.W.2d 694, 696

(Tex. 1942)).  The negative implication of this principle is that for *other* purposes, and

within the meaning of *other* statutes, a lien might be classified as an interest in land.

Although helpful, neither ***R. L. Sweet Lumber Co.*** nor ***Anheuser-Busch*** is dispositive.  Our

concern is in determining the legislature's intent solely with respect to section 527.150.

Case law involving earlier versions of this statute can be read to support the

views of both Appellants and Lienholders.  For example, in ***Wheeler v. Reynolds***

***Land Co.***, our high court stated:

> No one has a right to require another to come into court and show his title
> who cannot himself show at least a prima facie title, and no plaintiff is
> entitled to a decree declaring the claim of another invalid until he has shown
> that he himself has a better claim; in equity, as at law, if one recovers at all it
> must be on the strength of his own title. . . .  If the plaintiff has no valid title,
> it is no concern of his to know whether or not the defendant's claim is valid.

91 S.W. 1050, 1053 (Mo. 1906).  *See also* ***Pitts v. Pitts***, 388 S.W.2d 337, 341 (Mo. 1965)

("[t]he general rule is that the plaintiff in an action to quiet title must recover on the strength

of his own title.  If he has no title, plaintiff is not generally aggrieved by an adjudication of

title in the defendants").

In contrast, in ***Mann v. Doerr***, the Court interpreted "interest" in a former version of

the statute to include a tenant with a written lease such that the tenant was a necessary party.

121 S.W. 86, 88 (Mo. 1909).  Because a tenant is not a fee owner, ***Mann*** would support

Lienholders' view that title is not required to have an "interest" in a quiet title case.  In cases

discussing both the current version and a former version of the statute, our high court stated

that the statute "is to be liberally construed."  ***Bailey v. Williams***, 326 S.W.2d 115, 121 (Mo.

1959), and ***White v. Kentling***, 134 S.W.2d 39, 44 (Mo. 1939).

In *Johnson v. GMAC Mortg. Corp.*, after a trial court dismissed a quiet title action because the defendant-lender asserted a lien interest and not a claim of fee title, the western district of our court reversed that decision and held that the homeowner had stated a valid quiet title claim against a lender because "section 527.150 does not apply just to fee title interest but to any 'interest' in such property." 162 S.W.3d 110, 123 (Mo. App. W.D. 2005).

Contrary to Coverdell's contention in his reply brief that "sections 527.150.1 and .2 create a narrow statutory scheme to determine title to real estate among the competing potential owners of property[,]" we, like our western district colleagues, find section 527.150 to be "very broad, providing that almost any issue concerning an interest in realty may be decided in a quiet title action." *Ortmeyer v. Bruemmer*, 680 S.W.2d 384, 395 (Mo. App. W.D. 1984). For this reason, *Wheeler* and *Pitts* may be distinguished as addressing standing when the petitioner is seeking to have title quieted in itself, not when the petitioner is attempting to establish or protect a lesser interest in the real property at issue. A broad interpretation dictates that a party would have a legally protectable interest sufficient to bring a suit to quiet title if that party would stand to acquire or lose their stake in the property by the court's judgment. In other words, if the liens asserted by U.S. Bank and Arvest could be defeated by Coverdell's adverse possession claim, then they would be directly affected by the outcome.[26] Here, neither party addresses whether the liens would cease to exist or how the priority of Lienholders' liens would be determined if Coverdell was found to be the owner of some or all of the property at issue. Instead, the parties frame the

---

[26] Coverdell makes the counterintuitive argument that "U.S. Bank has no standing to pursue quiet title claims against Coverdell and other interested parties who are not bound by the loan documents that gave rise to U.S. Bank's concerns[,]" but he cites no authority for that assertion. We have no need to determine at this point whether, if Coverdell's adverse possession claim ultimately prevails against record owners, his thus-acquired property would be immune to any liens accepted by the record owners.

issue as whether the liens asserted by Lienholders amount to an "interest in real property" under section 527.150.

Section 527.150 does not specify that the "interest in real property" must be an "ownership" interest, and we see no practical reason to inject such a requirement. For example, in *In re Foreclosure of Liens for Delinquent Land Taxes*, 226 S.W.3d 250, 252 (Mo. App. E.D. 2007), a lienholder filed a motion to set aside a tax sale and the purchaser argued that the lienholder was not an interested party under section 92.840.6 (dealing with tax sales). In holding that a lienholder was an interested party, the Eastern District specifically noted that lienholders often have the greatest financial interest at stake in a tax sale and found no evidence or authority within the statute to indicate that only a party with an occupancy interest could restore all previously interested parties' property rights. *Id*. at 255-56. Similarly, a lienholder may have the greatest financial interest at stake in the outcome of an action to quiet title, leaving no basis for an argument that U.S. Bank and Arvest are not "sufficiently affected by the conduct complained of in the suit[.]" *In Their Representative Capacity as Trs. for Indian Springs Owners v. Greeves*, 277 S.W.3d 793, 798 (Mo. App. E.D. 2009).

"[W]ords or phrases are known by the company they keep." *Short v. Short*, 947 S.W.2d 67, 71 (Mo. App. S.D. 1997). Subsection 2 of section 527.150 specifically provides that a court may "finally determine any and all rights, claims, interest, *liens* and demands, whatsoever of the parties . . . affecting said real property[.]" (Emphasis added.) To hold that a lienholder has an interest when the lienholder is defending a lawsuit, *Johnson*, 162 S.W.3d at 123, but not when the lienholder is intervening in the action would create an internal inconsistency between subsection 1 and subsection 2 of section 527.150 — a

36

lienholder would have an "interest" for purposes of subsection 2, but that same lienholder would not have an "interest" for purposes of subsection 1.

We see no basis to create separate avenues of defining an "interest" based upon the procedural posture of the case instead of upon the nature of the interest at issue. Instead, we read subsections 1 and 2 to complement one another. Consistent with that interpretation, Coverdell's motion to strike U.S. Bank and Arvest as parties is denied.

*Coverdell's Point I – Reliance on the Special Master*

Coverdell's first point claims the trial court erred in sustaining "all Respondents' motions for summary judgment" when Coverdell "failed to timely respond" because the special master put the scheduling order "on hold" and then "formalized a new scheduling order[.]" The point further contends that "Rule 68.01(e), due process and fundamental fairness permit" reliance on such directions by a special master.[27] Respondents' arguments in opposition include that the special master did not issue a new scheduling order, and Coverdell did not reasonably rely on the dates provided by the special master for filing and responding to motions for summary judgment.

At the March 8, 2013 hearing, the special master stated that the existing scheduling order's requirement that responses to summary judgment motions be filed on March 28, 2013 was not "going to make it[.]" The special master accepted partial responsibility for that situation based upon his previous instructions to put matters "on hold" until a hearing could be held. The special master eventually stated during that same proceeding that

---

[27] Coverdell also argues under this point that he did not "fail to present material disputes as to facts regarding the ownership of the land in his responses[,]" and he argues in his reply brief that the Lienholders were not entitled to summary judgment. These claims were not included in his point relied on and we do not consider them. *See Walton v. City of Seneca*, 420 S.W.3d 640, 648 n.9 (Mo. App. S.D. 2013) (arguments that are not included in the point relied on are not preserved for review and we are not required to address them); *Smith v. Brown & Williamson Tobacco Corp.*, 275 S.W.3d 748, 796 (Mo. App. W.D. 2008) (argument raised for first time in reply brief is not considered).

37

summary judgment motions should be filed by June 3, 2013, responses were to be filed by July 1, 2013, and sur-replies were to be filed two weeks later.

While a trial court has authority under Rule 44.01(b) to expand the time allowed for a response to a summary judgment motion, *Scottsdale Ins. Co. v. Addison Ins. Co.*, 448 S.W.3d 818, 825, (Mo. banc 2014), "[a] court's decision on a party's request for additional time is reviewed for an abuse of discretion." *Id.* Here, no order formalizing the special master's stated timeline during the March 8, 2013 hearing has been produced by Coverdell. In addition, the special master's report makes no reference to such dates, additional proceedings held before the special master on March 26, 2013 have not been transcribed or made a part of the legal file, and Coverdell's April 5, 2013 motion for an extension of time to respond to Arvest's summary judgment asserted that the due date for his response was April 3, 2013, not July 1, 2013.

Assuming, *arguendo*, that Coverdell would have been justified in relying upon the extended dates provided by the special master on March 8, 2013, a claim of error based on the entry of a summary judgment before those dates expired does not require reversal because Coverdell has failed to show that the alleged error was material. Rule 84.13(b) provides that a judgment cannot be reversed unless the error "materially affected the merits of the action." *See also Housing Auth. of City of Rolla v. Kimmel*, 771 S.W.2d 932, 936 (Mo. App. S.D. 1989). Because Coverdell's counsel informed the trial court that Coverdell could file responses to the summary judgment motions by May 20, 2013, we cannot say that the trial court's failure to follow the extended dates mentioned by the special master materially affected the merits of the action. *Cf. Fleischaker v. Headlee*, 99 S.W.3d 540, 544-45 (Mo. App. S.D. 2003) (no abuse of discretion in entering summary judgment where

extension order did not state a deadline for a response but party acknowledged on appeal that she had sufficient time to respond and had prepared a response before learning that judgment had been entered).

Indeed, while Coverdell argues he did not "fail to present material disputes as to facts regarding the ownership of the land in his responses[,]" and he points to the jury's verdict before the 2010 judgment, he says nothing about the evidence he believes he would have been able to present if he had been given additional time to conduct discovery. His assertion that he had already presented material factual disputes sufficient to prevent the entry of a summary judgment against him undercuts his current insistence that he needed additional time in which to respond to the motions for summary judgment. *Cf. **White v. City of Ladue***, 422 S.W.3d 439, 446 (Mo. App. E.D. 2013) ("if the discovery requested was not likely to produce evidence sufficient to defeat the . . . motion for summary judgment, the failure of the trial court to grant the requested discovery was harmless error").

Coverdell also argues that even "though [he] responded hurriedly to the summary judgment motions prior to the May 29, 2013 hearing, the trial court refused to consider Coverdell's filings." While we need not consider this argument because it is not contained in his point, *Walton*, 420 S.W.3d at 648 n.9, we also note that he fails to cite the record in support of his claim that the trial court refused to consider his responses. The trial court stated at the previous hearing that it would "listen to anybody that has anything to say" at the May 29, 2013 hearing and then rule. The record of the May 29, 2013 hearing commenced with Coverdell's additional counsel informing the trial court that he understood the trial court was "going to make a procedural ruling" and that he had "been able to put what we need to put in the record for that purpose for appeal if that happens." Any merits that the

responses filed a day after Coverdell's self-imposed deadline might have had were not brought to the trial court's attention for consideration. This provides additional support for our conclusion that Coverdell has failed to demonstrate that he was prejudiced by the trial court's failure to follow the extended dates mentioned by the special master. *Cf. **Ozark Mountain Timber Prods., Inc. v. Redus***, 725 S.W.2d 640, 645 (Mo. App. S.D. 1987) ("[i]t is well established that an appellate court will not, on review, convict a trial court of error on an issue which was not put before it to decide").

Coverdell's Point I is denied.

*Coverdell's Point II – Absence of an Alleged Indispensable Party*

The second point presented by Coverdell claims the trial court lacked authority to render "any judgment" in this case because it not only "failed to permit an indispensable party to intervene" but it "expressly prohibited such indispensable party from intervening by striking its pleadings in direct contravention of this Court's mandate." Coverdell asserts that an appellate court must consider whether an indispensable party was not joined even if it is not raised by the parties, and "[w]hen an indispensable party is not joined in a case, any judgment recorded by the court, in the absence of an indispensable party, must be reversed and remanded[,]" citing ***Heitz v. Kunkel***, 879 S.W.2d 770, 772 (Mo. App. S.D. 1994).[28] Coverdell argues that Rule 52.04(a) requires a court to order the joinder of an indispensable party and that "[w]hen title to real estate is in question, all claimants of record title are

---

[28] Coverdell's related reliance on Rule 55.27(g)(2), Rule 87.04, and section 527.110 for his argument that "[t]he absence of an indispensable party may be raised at any stage of the proceedings, including for the first time on appeal[,]" is flawed. Of these authorities, only the former version of Rule 55.27(g)(2) expressly addressed the ability to raise the failure of an indispensable party on appeal, and it provided that "a defense of failure to join a party indispensable under Rule 52.04" was permitted to be raised in particular pleadings, "or at the trial on the merits, or on appeal." This rule was changed in 2011 (effective January 1, 2012), and the provision permitting such a defense to be raised at trial or on appeal was removed. Rule 55.27(g)(2).

40

indispensable parties[,]'" quoting *Neal v. Drennan*, 640 S.W.2d 132, 137 (Mo. App. W.D. 1982).

Rule 52.04(a) addresses the persons to be joined if feasible. Subsection (b) provides that if a party described in Rule 52.04(a) "cannot be made a party," and that party is also found to be "indispensable" as further provided in subsection (b), the action should be dismissed.[29] "We will affirm a trial court's decision under Rule 52.04 [regarding joinder of parties] unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it misinterprets or misapplies the law." *ADP Dealer Servs. Grp. v. Carroll Motor Co*, 195 S.W.3d 1, 9 (Mo. App. E.D. 2005).

> "A party must first be found necessary to a lawsuit before we consider whether that party is indispensable." *Heitz*[, 879 S.W.2d at 771]. "If the answer [to this preliminary question] is in the negative, no further consideration need be given to the indispensability of that party." *State ex rel. Twenty–Second Judicial Circuit v. Jones*, 823 S.W.2d 471, 475 (Mo. banc 1992). "A person is a necessary party if that person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may, as a practical matter, impair or impede

---

[29] Subsections (a) and (b) of Rule 52.04 provide:

> **(a) Persons to Be Joined if Feasible.** A person shall be joined in the action if: (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant.
>
> **(b) Determination by Court Whenever Joinder Not Feasible.** If a person as described in Rule 52.04(a)(1) or Rule 52.04(a)(2) cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it or should be dismissed, the absent party being thus regarded as indispensable. The factors to be considered by the court include: (i) to what extent a judgment rendered in the person's absence might be prejudicial to that person or those already parties; (ii) the extent to which by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (iii) whether a judgment rendered in the person's absence will be adequate; and (iv) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

the person's ability to protect that interest." *Citizens Ins. Co. of Am. v. Leiendecker*, 962 S.W.2d 446, 450 (Mo. App. E.D. 1998). "It has been determined that an 'interest' which compels joinder is not one which is merely consequential, remote or a conjectural possibility of being somehow affected by the result of an action." *Moschenross v. St. Louis Cnty.*, 188 S.W.3d 13, 25 (Mo. App. E.D. 2006). The interest "must be such a direct claim upon the subject matter of the action that the joined party will either gain or lose by direct operation of the judgment to be rendered." *State ex rel. Emcasco Ins. Co. v. Rush*, 546 S.W.2d 188, 197 (Mo. App. St.L.D. 1977). "If joinder of such a necessary party is not feasible, 'the court shall determine whether in equity and good conscience the action should proceed among the parties before it or should be dismissed, the absent party being thus regarded as indispensable.'" *Jones v. Jones*, 285 S.W.3d 356, 360 (Mo. App. S.D. 2009) (quoting Rule 52.04(b)).

*Roberts Holdings, Inc. v. Becca's Barkery, Inc.*, 423 S.W.3d 920, 927-28 (Mo. App. S.D. 2014).

The main flaw in Coverdell's point relied on is that it does not name the alleged "indispensable party." It also does not expressly identify any "claimants of record title" who were not already parties to the case. *See Neal*, 640 S.W.2d at 137. Even Coverdell's argument in support of his point fails to mention any missing entity he claims was necessary to the adjudication of the claims asserted in the lawsuit.

Coverdell's argument simply states that "various corporate entities attempted to seek intervention" and that "[t]hese entities maintained ownership interests in the subject real estate and had previously filed deeds to the subject property and their interests were brought before the trial court through various filings, including an answer, counterclaim and cross-claim in the case." Coverdell does state that "[a]mong these entities was one, The Branson Label, Inc., [("Branson Label"),] that received a deed to the subject property *prior* to 1993; which is a date before Tori both sued Empire and dismissed its suit against Empire." But, having said this, Coverdell does not contend that either Branson Label or Tori is specifically asserting a present claim to the property involved in the instant case. In other words,

42

Coverdell does not claim that these "ownership interests" and "filed deeds" were anything more than historically related to the claims pending before the trial court.

Further, Coverdell does not cite the record in support of any of his claims. "All factual assertions in the argument shall have specific page references to the relevant portion of the record on appeal, i.e., legal file, transcript, or exhibits." Rule 84.04(e). Coverdell cites only his third point in support of his assertion regarding Branson Label.[30] And as authority for his next contention -- that "the trial court overruled these parties' attempts to intervene and further ordered that all their filings be stricken" -- Coverdell relies on two pages in the appendix to his brief that purport to be: an "**ORDER**" dated December 14, 2009 and an "**ORDER STRIKING ALL DOCUMENTS FILED BY PETER REA**" dated February 24, 2012.[31] Even if we could consider these orders, they do nothing on their face to establish that Branson Label, or anyone else listed in them, made a claim of record title relevant to the 2003 case so as to make it, or any other entity, a necessary party.

As Empire points out, Coverdell has not identified "any 'direct claim' by the parties he claims are indispensable." We cannot tell from Coverdell's point and argument whether

---

[30] Point III states:

> The trial court erred in dismissing [Appellants' claim for quiet title] *because* [it] properly stated a cause of action in quiet title against [Empire] *in that* [Coverdell] received a general warranty deed to real property in 1999 from Tori, which property both [Branson] and [Empire] claim as theirs, without notice of the 1993 dismissal with prejudice of Tori's Declaratory Judgment Petition against [Empire] due to [Empire's] failure to record Tori's dismissal with prejudice as required by [s]ection 511.320[.]

[31] Coverdell does not also identify these documents as being included in the legal file, but Branson acknowledges in its brief that Branson Label "was denied leave to intervene on December 14, 2009[.]" Branson further acknowledges that "[a]s [Mr.] Rea had continued to file voluminous pleadings, motions and letters with the trial court after the denial of his prior motion . . . he was again denied intervention, and an order was entered on February 24, 2012 striking all documents filed by him." The docket entries in the legal file reveal that on December 14, 2009, the trial court found "that the administratively dissolved corporations, Branson Papers, Inc. and B'Cuz, Inc. are in default and [j]udgment is entered against those entities. As to [Tori] and [Branson Label,] the court deems their pleadings to be motions to intervene and those motions are denied." A docket entry for February 24, 2012 includes "Order [s]triking all documents filed by [Mr. Rea]."

43

Branson Label or other "various entities" were even necessary parties under Rule 52.04(a), much less whether they should have been deemed indispensable parties under Rule 52.04(b). Coverdell's Point II is denied.

*Coverdell's Point III – Dismissal of Appellants' Deed-Based Quiet Title Claim*

Coverdell's third point contends the trial court erred in dismissing Appellants' claims based upon a deed (Count I) when a proper claim was stated against Empire in that Coverdell received a warranty deed from Tori in 1999 for the "property" claimed by both Branson and Empire, and Coverdell had no notice of the 1993 dismissal of Tori's suit because it was not recorded by Empire as required by section 511.320.

Before defending the trial court's dismissal of the deed-based claim, Respondents insist that Coverdell failed to preserve this issue for review because he did not include the orders dismissing this claim with his notice of appeal, citing Rule 81.08(a). Rule 81.08(a) requires the notice of appeal to "specify . . . the judgment or order appealed from[.]" Coverdell's notice of appeal specifically referenced Branson's judgment. As Coverdell points out in his reply brief, Branson's judgment opened with a paragraph reciting the matters before the trial court for purposes of that judgment and specifically included the trial "[c]ourt's prior orders dismissing the claims of [Appellants] based on *res judicata*[.]" One of the bases for dismissing Appellants' deed-based claim first asserted by Branson in its motion to dismiss Appellants' claims was *res judicata*, and while the trial court did not state its reasons for granting Branson's motion to dismiss in June 2012, it specifically included *res judicata* as a basis for denying Appellants' reasserted claims.

Arvest also contends that Point III is not preserved because Coverdell did not bring his argument concerning section 511.320's recording requirement to the attention of the trial

44

court. But, at the August 2012 hearing, Appellants' counsel went on the record to agree with Community Bank's argument citing section 511.320 in support of the position that the 1993 dismissal of Tori's suit, if a judgment, had to be recorded in order to be effective. Thus, Coverdell's position had been brought to the attention of the trial court before Branson's judgment was entered.

A trial court's dismissal of a claim based upon the pleadings is reviewed *de novo*. ***Gibbons v. J. Nuckolls, Inc.***, 216 S.W.3d 667, 669 (Mo. banc 2007). Whether a dismissal should be with or without prejudice is within the trial court's discretion. ***Allen v. City of Greenville, Mo.***, 336 S.W.3d 508, 512 n.3 (Mo. App. S.D. 2011). "In order to obtain relief on appeal, a party must not only demonstrate error, but also prejudice resulting from that error." ***Black v. Rite Mortg. & Fin., Inc.***, 239 S.W.3d 165, 169 (Mo. App. E.D. 2007).

Assuming, *arguendo*, that it was error to dismiss Appellants' claim of title based upon a deed, we find no prejudice. "In a quiet title action, where each party is claiming title against the other party, the burden of proof is upon each party to prove better title than that of his adversary." ***Ortmeyer***, 680 S.W.2d at 395. As previously noted, Coverdell did not properly respond to the uncontroverted facts set forth in the summary judgment motions filed by Arvest, Branson, and U.S. Bank. "The facts contained in affidavits or otherwise in support of a party's motion are accepted 'as true unless contradicted by the non-moving party's response to the summary judgment motion.'" ***Goerlitz***, 333 S.W.3d at 452-53. "Failure to respond to a motion for summary judgment with specific facts showing genuine material issues results in admission of the facts alleged." ***Gen. Am. Life Ins. Co. v. Barrett***, 847 S.W.2d 125, 129 (Mo. App. W.D. 1993).

It is true that "the key to summary judgment is the undisputed right to judgment as a matter of law, not simply the absence of a fact question." ***State ex rel. Nixon v. Boone***, 927 S.W.2d 892, 895 (Mo. App. W.D. 1996). But Coverdell does not contend that Arvest's, Branson's, and U.S. Bank's uncontroverted material facts concerning the chain of title based upon deeds are insufficient to support their judgments as a matter of law. We will not take on the role of Coverdell's advocate in an attempt to find, research, and assert a legal deficiency as to the validity of a deed in one or more of the summary judgments to which Respondents have not otherwise had an opportunity to respond. *Cf.* ***Huffman v. SBC Servs., Inc.***, 136 S.W.3d 592, 593-94 (Mo. App. S.D. 2004) ("[i]t is not the function of an appellate court to search the record to identify possible errors and research any issues so revealed. In fairness to [the r]espondent, we cannot become [the a]ppellant's advocate") (citation omitted))."

Coverdell's Point III is denied.

*Coverdell's Point IV – Dismissal of Appellants' Adverse-Possession Claim*

Coverdell's fourth point contends the trial court erred in dismissing Appellants' claims based upon adverse possession (Count II) "because *res judicata* did not apply and the pleadings were proper in that Coverdell's adverse possession claim properly set out all the elements of an adverse possession claim." As with Point III, Respondents claim that Coverdell failed to preserve this issue because the orders dismissing the adverse possession claim were not included with Coverdell's notice of appeal. For the same reasons previously articulated, we reject that claim.[32]

---

[32] Arvest also contends that Coverdell "failed to raise the arguments presented herein to the trial court." Arvest does not develop this argument any further, and given the effort to reassert Appellants' claims following their initial dismissal, we reject this claim.

Branson and U.S. Bank rely on Rule 67.01, which provides, *inter alia*, that "[a] dismissal with prejudice bars the assertion of the same cause of action or claim against the same party." They also rely on the statement in *Golden Valley Disposal, LLC v. Jenkins Diesel Power, Inc.*, 183 S.W.3d 635, 641 (Mo. App. S.D. 2006), that this rule extends "*res judicata* principles to cases which are dismissed with prejudice without reaching the merits of the litigation." But *Golden Valley Disposal* also stands for the proposition that "the absence of a final judgment of dismissal with prejudice in" the first lawsuit may prevent Rule 67.01's application in a second lawsuit. *Id.* Here, the 1993 dismissal was with prejudice, but it was in the form of a docket entry that did not specify that the entry was a judgment. Branson and U.S. Bank point out that the version of Rule 74.01 in effect in 1993 did not expressly require that a judgment be denominated as such "in order to be final," but they cite no authority for the proposition that this particular docket entry must now be treated as a final judgment.[33]

Assuming, *arguendo*, that the 1993 dismissal of Tori's suit was a final judgment triggering Rule 67.01's bar on reassertion of the same cause of action or same claim, this does not automatically support the outright dismissal of Coverdell's adverse possession claim. While there was an assertion of the elements of adverse possession in Tori's suit, this claim dated to the 1993 dismissal, at the latest. Under the proper circumstances, an adverse possession claim may ripen over the course of ten years. *See **Kohler v. Bolinger***, 70 S.W.3d

---

[33] In 1993, Rule 74.01(a) provided: "**Included Matters.** 'Judgment' as used in these Rules includes a decree and any order from which an appeal lies." Missouri Court Rules (1993). Rule 74.01(a) currently states:

> **Included Matters**. "Judgment" as used in these rules includes a decree and any order from which an appeal lies. A judgment is rendered when entered. A judgment is entered when a writing signed by the judge and denominated "judgment" or "decree" is filed. The judgment may be a separate document or entry on the docket sheet of the case. A docket sheet entry complying with these requirements is a judgment unless the docket sheet entry indicates that the court will enter the judgment in a separate document. The separate document shall be the judgment when entered.

616, 619 (Mo. App. W.D. 2002) ("[o]nce the ten-year period has run and the other adverse elements are satisfied, the possessor is vested with title and the record owner is divested") (quotation omitted).  Even though Appellants' claims alleged continuous occupation of "Property A and Property B since 1907[,]" thereby giving rise to the conclusion that title divested from the record owner as far back as to pass through to Tori to Coverdell, and in his brief Coverdell maintains that Tori's predecessor obtained some of the property it conveyed to Tori by adverse possession, Coverdell also alleged in both Appellants' claims and Appellants' reasserted claims that *he* "has had continuous, uninterrupted possession of Property A and Property B for a period of more than ten (10) consecutive years."  Thus, Coverdell's claim for adverse possession did not rest exclusively on Tori's claim for adverse possession, and his own independent claim for adverse possession would not be barred by *res judicata* or Rule 67.01.

We next consider Coverdell's assertion that Count II should not have been dismissed because he had adequately pleaded a claim for adverse possession.  Branson and U.S. Bank are correct in pointing out that "Missouri is not a 'notice pleading' state[,]" and "Missouri has remained a 'fact pleading' state."  ***ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.***, 854 S.W.2d 371, 379 (Mo. banc 1993).

> Rule 55.05 requires a pleading that sets forth a claim for relief to contain:  "(1) a short and plain statement of the facts showing that the pleader is entitled to relief and (2) a demand for judgment for the relief to which the pleader claims to be entitled."  Thus, plaintiffs in a case must plead "ultimate facts" of their case.  *M & H Enters. v. Tri–State Delta Chems., Inc.*, 984 S.W.2d 175, 181 (Mo. App. S.D. 1998).  A petition must contain allegations of fact in support of each essential element of the cause sought to be pleaded.

***Sparks v. PNC Bank***, 400 S.W.3d 454, 460 (Mo. App. E.D. 2013).

"To acquire title by adverse possession or prescription, possession must be:  (1) hostile, that is, under a claim of right, (2) actual, (3) open and notorious, (4) exclusive, and (5) continuous for the necessary period of years prior to the commencement of action."  *Watson v. Mense*, 298 S.W.3d 521, 526 (Mo. banc 2009).

Although Coverdell argues that "the proper course" for Respondents "would have been a motion to make more definite pursuant to Rule 55.27(d)[,]" and he complains that he was not afforded "the opportunity to amend[,]" Coverdell does not claim that he could have amended his adverse possession claim to state additional facts if he had been given the opportunity to do so.  Instead, he asserts that his adverse-possession claim was adequately pleaded.

In support of that assertion, Coverdell maintains his pleading is similar to the one affirmed in *Thomas v. B.K.S. Dev. Corp.*, 77 S.W.3d 53, 58 (Mo. App. E.D. 2002).  In that case, the Eastern District rejected a claim that the petition should have been dismissed for failure to sufficiently allege the elements of adverse possession.  *Id.*  In so ruling, it noted that "[t]he law generally favors trial on the merits and the criteria for judging the sufficiency of petitions have been developed to promote this purpose."  *Id.* at 57-58.  "A petition cannot be dismissed for failure to state a claim unless it appears that the plaintiff can prove no set of facts in support of the claim that would give a right to relief."  *Id.* at 58.

> Thomas's petition, filed in 1999, alleged that she "openly, notoriously and adversely occupied Lots 23 and 24 of Country Club Estates from 1982 to the present and as a result has acquired ownership by adverse possession." Although she did not use the precise language of each element of adverse possession, we liberally construe her averments and find that she adequately pleaded a cause of action for adverse possession.

*Id.*

Branson and U.S. Bank attempt to distinguish the *Thomas* decision by asserting that: (1) Coverdell's description of the land adversely possessed was not as clear as the description in *Thomas*; and (2) Coverdell's assertions regarding the possession of the property were "vague" when compared to those made in *Thomas*. Here, it is true that Appellants' claims initially failed to specify which of the properties described therein were actually Properties A and B, and what property constituted "Property B." If the contested real estate cannot be ascertained from the description given in the claim, then a cause of action is not stated. *See Ollison v. Village of Climax Springs*, 916 S.W.2d 198, 201 (Mo. banc 1996). But legal descriptions for Properties A and B were included in Appellants' reasserted claims, making clear that Coverdell could satisfy the requirement that he identify the property being claimed. It is also true that the legal descriptions for similar areas identified on maps varied, but Coverdell did not fail to state a claim because he used different language than Respondents to identify the same plot of earth.

In addition, the specific facts Branson and U.S. Bank rely on in their attempt to distinguish *Thomas*, such as Thomas's activities on the land in making a parking area, keeping horses, cutting timber, and so forth, were not taken from her pleading; they were apparently taken from evidence later adduced at trial. 77 S.W.3d at 57. Branson and U.S. Bank argue that *Thomas* is "a decision unique to the facts of that case" and argue that it is "only . . . applicable for its general principles of fact pleading." This argument does not help them when the facts pleaded in *Thomas* are so similar to those pleaded by Coverdell in the instant case.

Branson and U.S. Bank concede the standard noted above -- that a claimant does not have to aver "'evidentiary or operative facts'" but it "'must plead ultimate facts'" without

50

reliance on "'mere conclusions[,]'" quoting *Ford Motor Credit Co. v. Updegraff*, 218 S.W.3d 617, 621 (Mo. App. W.D. 2007) (internal quotation omitted).[34] Here, Coverdell did not simply aver, in conclusory fashion, that he adversely possessed Properties A and B. He specifically pleaded the required ultimate facts of hostile; actual; open and notorious; and continuous possession of the land at issue for at least ten years.

The one element we notice missing from Coverdell's claim is that he exclusively possessed the property. *See Watson*, 298 S.W.3d at 526. "The element of 'exclusive possession' means that the claimant must show that he held possession of the land for himself, as his own, and not for another." *Machholz-Parks v. Suddath*, 884 S.W.2d 705, 708 (Mo. App. S.D. 1994). Here, Coverdell asserted that, along with his predecessors, he had "continuously occupied" Properties A and B, that such possession had been hostile to the rights of the other parties and "under color of title[,]" that it was "actual, open and notorious[,]" and that the continuous possession had been uninterrupted for 10 consecutive years--specifically, that it had been continuously occupied by Coverdell and his predecessors since 1907. But we note as well that the petition found sufficient in *Thomas*

---

[34] The other cases cited by Branson and U.S. Bank are either not adverse possession cases or they go to the sufficiency of the evidence supporting those claims. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (claim of antitrust conspiracy); *Luethans v. Wash. Univ.*, 894 S.W.2d 169, 171 (Mo. banc 1995) (wrongful discharge), *abrogated by Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 102 (Mo. banc 2010); *M.H. Siegfried Real Estate v. City of Independence*, 649 S.W.2d 893, 894 (Mo. banc 1983) (claim resulting from "accumulation of surface water on land"); *Smith v. Consol. Sch. Dist. No. 2*, 408 S.W.2d 50, 52 (Mo. banc 1966) (personal injury claim); *Int'l Div., Inc. v. DeWitt & Assocs., Inc.*, 425 S.W.3d 225, 226 (Mo. App. S.D. 2014) (claim for damage to office space); *Fandel v. Empire Dist. Elec. Co.*, 393 S.W.3d 100, 104-05 (Mo. App. S.D. 2013) (genuine issue of material fact concerning whether predecessors intended to exclude others prevented partial summary judgment in favor of adverse possessor); *Jennings v. Bd. of Curators of Mo. State Univ.*, 386 S.W.3d 796, 797 (Mo. App. S.D. 2012) (claims related to employment at a university); *Brock v. Blackwood*, 143 S.W.3d 47, 52 (Mo. App. W.D. 2004) (dispute over trust); *Hoag v. McBride & Son Inv. Co.*, 967 S.W.2d 157, 164 and 174-75 (Mo. App. E.D. 1998) (covenant concerning land, misrepresentation claims, and dedication claims); *Duggan v. Pulitzer Pub. Co.*, 913 S.W.2d 807, 808 (Mo. App. E.D. 1995) (defamation claim); *Ortmeyer*, 680 S.W.2d at 387 (dismissal of case involving claim of adverse possession at close of plaintiff's evidence reversed in part); and *Teson v. Vasquez*, 561 S.W.2d 119, 123, 128, (Mo. App. St.L.D. 1977) (evidence was sufficient to quiet title in favor of some adverse claimants, but not as to other adverse claimants).

was also apparently devoid of a claim of exclusivity, and the Eastern District liberally construed the petitioner's allegations even though she had failed to precisely aver "each element of adverse possession[.]" 77 S.W.3d at 58. Moreover, Branson's argument in its supplemental dismissal motion that Coverdell should have "plead[ed] a 'short and plain statement of facts'" made no specific complaint about a failure to allege the element of exclusive possession. *Thomas* also noted that "[c]olor of title is not an element of adverse possession, but it serves to extend actual possession of some portion of the land claimed to constructive possession of the whole tract described in the instrument providing the basis for color of title." *Id.* at 59. Coverdell's allegation that he possessed Properties A and B under color of title may be liberally construed as also alleging that Coverdell held the whole tract exclusively for himself, and not for other alleged owners.

Coverdell's adverse-possession claim is different from his deed-based quiet-title claim insofar as the summary judgments are concerned. Those judgments removed the possibility of title by deed by Coverdell as to specifically described real estate based upon the strength of Branson and Empire's claim of record title and the absence of Appellants in the proper chain of title to precisely described real estate. But adverse possession, by its nature, is "in opposition to the title of the record owner[,]" *Teson*, 561 S.W.2d at 125, and when adverse possession is actually accomplished, "the possessor is vested with title and the record owner is divested." *Kitterman v. Simrall*, 924 S.W.2d 872, 876 (Mo. App. W.D. 1996).

Portions of the summary judgments stated that Appellants had not actually possessed or occupied at least some of the real estate specifically described in those judgments, and U.S. Bank's judgment even broadly declared that "neither Coverdell nor [CEI] has made any

showing of any actual possession, present ability to control *the land* or any intention to exclude others from *the land* they do not control."  (Emphasis added.)  These declarations are unaccompanied by any reference to any extent that "Properties A and B" as described by Appellants may have matched up with or overlapped specific portions of the Lots or other described parts of the Lots (namely Retail North, Northwest Tracts, Western and Eastern Peninsulas, Park Addition, and Branson Town) in the summary judgments.  We cannot tell from the face of the summary judgments whether a claim by Coverdell that he had acquired Properties A and B by adverse possession would be precluded by the uncontested facts set forth in the summary judgment motions that were constructively admitted by him due to his failure to controvert them.

Point IV is granted, and the matter is remanded for further proceedings limited to the resolution of Coverdell's claim for adverse possession of Properties A and B as described in Appellants' reasserted claims.  If that claim is found to be meritorious, the trial court will then declare the extent to which Coverdell's adverse possession precludes the quieting of title in favor of Branson and Empire.


DON E. BURRELL, J. - OPINION AUTHOR

MARY W. SHEFFIELD, P.J. - CONCURS

GARY W. LYNCH, J. - CONCURS

53

# Appendix

## Property A

All that part of the SE¼ of the NW¼ situate on the right bank of Roark Creek and that part of the NE¼ of the SW¼ in Section 33, Township 23, Range 21, EXCEPT a tract of land more particularly described as beginning at the NE corner of Park Addition to the City of Branson, Missouri thence North 2° 19' West to the Southerly bank of Roark Creek; thence in a Southerly direction with the Easterly and Southerly bank of said Roark Creek to the Northerly line of said Park Addition, thence Easterly to the point of beginning all hearings being referenced to the centerline of Sycamore Street as being due North and South.

## Property B

A parcel of land situated in the NE ¼ of the SW ¼ and the SE ¼ of the NW ¼ of Section 33, Township 23 North, Range 21 West, City of Branson, Taney County, Missouri, as per general warranty deed and being described as follows:

Commencing at the Northeast corner of Park addition to the City of Branson, Missouri, thence N 02°29'46" W along the established property line (as per survey of E.G. Nightingale, Book 13, Page 16) 27.80 feet to a set rebar being the point of beginning, thence continue N 02°29'46" W 749.81 feet to a reference point on the top bank of the month of Roark Creek, thence continuing N 02°29'46" W to the fluctuating waters edge of Roark Creek, thence easterly and southerly along the fluctuating waters edge of Roark Creek and Lake Taneycomo to a point being S 89°41'34" E of the point of beginning, thence N 89°41'34" W N 89°41'34"W to a set rebar being a reference point on the bank of said Lake Taneycomo, thence N 89°41'34" W 242.06 feet to the point of beginning.

## Eastern Peninsula

All that part of the Southeast quarter of the Northwest quarter and of the Northeast quarter of the Southwest quarter of Section Thirty-three, (33), Twp 23 North, Range 21 West described as follows: Beginning at a point on the left bank of White Rive in said NE ¼ of the SW ¼, Said point being 250 ft. South of the North line of said NE ¼ of SW ¼; thence west to a point on the high bench, 268 feet distance from the high bank of White River; thence on azimuths from magnetic North, North 13 degrees 48 minutes West 258 feet; thence North 8 degrees 50 minutes east, 346 feet, thence South 11 degrees 21 minutes West to an intersection with the east bank of Roar Creek; then along the east and South banks of Roark Creek to the confluence with White River; thence following the meander of said River bank to the point of beginning excepting a strip 80 feet wide along the said river bank in said northeast ¼ of

the southwest ¼ not belonging to the estate of said Henry H. Compton Deceased. Containing 3.36 acres more or less, the said parties of the first part retaining possession of so much of such premises not actually to be submerged by the lake water of a dam being constructed in White River, as may be necessary according to the rise and fall of said lake water for the maintenance of and access to a landing for their ferry along the back water in Roark Creek the party of the second party hereby consenting to the like maintenance of a ferry landing in the opposite bank of White River in the Southeast fr'l ¼ of the N.W. ¼ of said Section 33, in so far as said party of the second part's interest in and to said SE fr'l ¼ of the N.W. ¼ may be concerned.

## Branson Town

Beginning at a point on the left bank, descending of White River, where the Quarter Section line of Section 33, Township 23, Range 21, running east and west, intersects said bank, more particularly marked by two Sycamore trees, bearing three vertical axe marks; thence West 80 feet to a point; thence South 250 feet to a point, thence West 188 feet to an iron stake; thence South 17°42' East a distance of 360.4 feet to an iron stake; thence South 21°29' East a distance of 377.5 feet to an iron stake; thence South 27°40 East a distance of 378.6 feet to an iron stake; thence North 79°30' East a distance of 85.3 feet to an iron stake on the left bank descending of White River; thence upon the same course North 79°30' East a distance of 10 feet to the edge of left bank of White River descending; thence along said bank with the meanderings of White River to the Point of Beginning. All lying in Section 33, Township 23, Range 21, in Taney County, Missouri containing 5.75 acres more or less.

## Western Peninsula

A tract of land being a part of the Southeast Quarter of the Northwest Quarter and a part of the Northeast Quarter of the Southwest Quarter of Section 33, Township 23 North, Range 21 West, being more particularly described as follows: Beginning at the Northeast corner of Park Addition to the City of Branson, Missouri; thence North 2°19' West to the southerly bank of Roark Creek; thence in a southerly direction with the easterly and southerly bank of said Roark Creek to the northerly line of said Park Addition; thence easterly to the Point of Beginning, all bearings being referenced to the centerline of Sycamore Street as being due North and South.

## Park Addition

block 3, 4, and 5 of

Park Addition

# Retail Tract

## EXHIBIT A
### Retail Property Description

Lots 1, 3 and 4, BRANSON LANDING, a subdivision as per the recorded plat thereof, Plat Book/Slide G, pages 767-770, of the Taney County Recorder's Office, City of Branson, Taney County, Missouri,

ALSO, a part of Lot 6, BRANSON LANDING, a subdivision as per the recorded plat thereof, Plat Book/Slide G, pages 767-770, of the Taney County Recorder's Office, City of Branson, Taney County, Missouri, being more particularly described as follows:

1.) (B-1) Beginning at the Southwest corner of said Lot 6; thence North 26° 46' 18" West along the Westerly line of said Lot 6, 203.35 feet; thence North 74° 49' 13" East 23.01 feet; thence South 15° 10' 47" East 105.00 feet; thence South 60° 10' 47" East 84.85 feet; thence South 15° 10' 47" East 38.20 feet to a point on the South line of said Lot 6; thence South 80° 13' 42" West along South line 42.33 feet to the point of beginning; containing 0.10 acres, more or less; and

2) (B-2) Commencing at the Southwest corner of said Lot 6; thence North 26° 46' 18" West along the Westerly line of said Lot 6, 231.69 feet to the POINT OF BEGINNING; thence continuing North 26° 46' 18" West along Westerly line 146.91 feet; thence North 20° 45' 18" West along Westerly line 93.53 feet; thence North 67° 24' 07" East 61.25 feet; thence South 22° 35' 53" East 240.00 feet; thence South 67° 24' 07" West 53.55 feet to the point of beginning, containing 0.33 acres, more or less.

Together with those appurtenant easements as set forth in the Branson Landing Agreement Regarding Ratification, Confirmation and Acknowledgement, as recorded in Book 500, pages 2591-2601.

Together with those appurtenant easements as set forth in the Amendment, Severance and Ratification of Master Lease Agreement dated November 1, 2006, as recorded in Book 504, pages 1560.

LESS AND EXCEPT THE FOLLOWING TRACTS:

1) (Boutique Hotel Building 3) That portion of Lot 1 of Branson Landing, a subdivision recorded in Plat Book /Slide G, at Pages 767 through 770 of the Taney County Recorder's Office, said parcel being situated in the Southeast Quarter (SE1/4) of the Southwest Quarter (SW1/4) of Section 33, Township 23 North, Range 21 West of the fifth principal meridian, in the City of Branson, Taney County, Missouri, laying between the elevations of 718.90 and 743.65, based on NAVD 1988, Being more particularly described as follows:

Commencing at the Southeast corner of Lot 6 of said Branson Landing; Thence South 79°20'35" West a distance of 103.60 feet to the Southwest corner of Lot 6; thence South 28°32'51" West a distance of 385.41 feet to the Point of Beginning; Thence South 02°39'39" East a distance of 31.86 feet; Thence North 87°20'21" East a distance of 6.69 feet; Thence South 02°39'54" East a distance of 1.94 feet; Thence North 87°20'22" East a distance of

5.00 feet; Thence South 02°39'42" East a distance of 13.58 feet;
Thence South 87°20'22" West a distance of 4.50 feet; Thence North
02°39'42" West a distance of 2.00 feet; Thence South 87°20'22"
West a distance of 7.92 feet; Thence South 02°39'38" East a
distance of 2.00 feet; Thence South 87°20'22" West a distance of
9.75 feet; Thence South 02°39'38" East a distance of 163.00 feet;
Thence North 87°20'22" East a distance of 5.21 feet; Thence South
09°47'09" East a distance of 16.37 feet; Thence South 80°12'50"
West a distance of 90.33 feet; Thence North 09°47'10" West a
distance of 36.94 feet; Thence North 80°12'50" East a distance of
6.05 feet; Thence North 09°47'10" West a distance of 14.73 feet;
Thence North 80°12'50" East a distance of 38.08 feet; Thence
North 02°39'38" West a distance of 7.23 feet; Thence North
80°12'50" East a distance of 6.19 feet; Thence North 02°39'38"
West a distance of 14.86 feet; Thence South 87°20'22" West a
distance of 51.76 feet; Thence North 02°39'38" West a distance of
38.73 feet; Thence North 87°20'22" East a distance of 51.76 feet;
Thence North 02°39'38" West a distance of 15.11 feet; Thence
North 85°32'09" West a distance of 6.19 feet; Thence North
02°39'39" West a distance of 7.73 feet; Thence North 85°32'09"
West a distance of 42.58 feet; Thence North 10°03'02" West a
distance of 54.12 feet; Thence South 79°56'58" West a distance of
2.67 feet; Thence North 09°47'10" West a distance of 12.83 feet;
Thence North 80°12'50" East a distance of 10.92 feet; Thence
North 09°47'10" West a distance of 7.21 feet; Thence North
73°52'12" East a distance of 87.55 feet; Thence North 02°39'39"
West a distance of 0.50 feet; Thence North 87°20'21" East a
distance of 13.87 feet to the said Point of Beginning, Containing
0.43 acres of land, more or less.

2) (Boutique Hotel Below Condominium Units Building 3) That portion of
Lot 1 of Branson Landing, a subdivision recorded in Plat Book
/Slide G, at Pages 767 through 770 of the Taney County Recorder's
Office, said parcel being situated in the Southeast Quarter (SE1/4)
of the Southwest Quarter (SW1/4) of Section 33, Township 23 North,
Range 21 West of the fifth principal meridian, in the City of
Branson, Taney County, Missouri, laying between the elevations of
723.65 and 739.63, based on NAVD 1988, Being more particularly
described as follows:

Commencing at the Southeast corner of Lot 6 of said Branson
Landing; Thence South 79°20'35" West a distance of 103.60 feet to
the Southwest corner of Lot 6; Thence South 26°20'59" West a
distance of 432.64 feet to the Point of Beginning; Thence North
87°20'22" East a distance of 9.75 feet; Thence South 02°39'38"
East a distance of 158.46 feet; Thence North 87°20'25" East a
distance of 12.26 feet; Thence South 09°41'54" East a distance of
6.72 feet; Thence North 87°35'35" East a distance of 11.48 feet;
Thence South 09°47'10" East a distance of 67.42 feet; Thence
South 80°12'50" West a distance of 29.43 feet; Thence South
09°47'10" East a distance of 26.40 feet; Thence South 80°12'50"
West a distance of 85.48 feet; Thence North 09°47'10" West a
distance of 26.34 feet; Thence South 80°12'50" West a distance of
5.33 feet; Thence North 09°47'10" West a distance of 7.83 feet;
Thence South 80°12'50" West a distance of 0.67 feet; Thence North
09°47'10" West a distance of 12.00 feet; Thence North 80°12'50"
East a distance of 0.67 feet; Thence North 09°47'10" West a

distance of 33.08 feet; Thence North 80°12'50" East a distance of 91.00 feet; Thence North 09°47'09" West a distance of 16.37 feet; Thence South 87°20'22" West a distance of 5.21 feet; Thence North 02°39'38" West a distance of 168.00 feet to the said Point of Beginning, Containing 0.25 acres of land, more or less;

AND, That portion of Lot 1 of Branson Landing, a subdivision recorded in Plat Book /Slide G, at Pages 767 through 770 of the Taney County Recorder's Office, said parcel being situated in the Southeast Quarter (SE1/4) of the Southwest Quarter (SW1/4) of Section 33, Township 23 North, Range 21 West of the fifth principal meridian, in the City of Branson, Taney County, Missouri, laying between the elevations of 720.54 and 739.53, based on NAVD 1988, Being more particularly described as follows:

Commencing at the Southeast corner of Lot 6 of said Branson Landing; Thence South 79°20'35" West a distance of 103.60 feet to the Southwest corner of Lot 6; Thence South 23°51'18" West a distance of 422.29 feet to the Point of Beginning; Thence South 02°39'42" East a distance of 34.97 feet; Thence North 87°20'18" East a distance of 12.50 feet; Thence South 02°39'42" East a distance of 20.00 feet; Thence South 87°20'18" West a distance of 11.17 feet; Thence North 02°39'42" West a distance of 15.50 feet; Thence South 87°20'25" West a distance of 5.83 feet; Thence North 02°39'42" West a distance of 39.48 feet; Thence North 87°20'22" East a distance of 4.50 feet to the said Point of Beginning, Containing 0.01 acres of land, more or less.

3) (Lower Level Boutique Hotel Property Buildings 2 and 3) That portion of Lot 1 of Branson Landing, a subdivision recorded in Plat Book /Slide G, at Pages 767 through 770 of the Taney County Recorder's Office, said parcel being situated in the Southeast Quarter (SE1/4) of the Southwest Quarter (SW1/4) of Section 33, Township 23 North, Range 21 West of the fifth principal meridian, in the City of Branson, Taney County, Missouri, laying between the elevations of 709.61 and 723.11 based on NAVD 1988, Being more particularly described as follows:

Commencing at the Southeast corner of Lot 6 of said Branson Landing; Thence South 79°20'35" West a distance of 103.60 feet to the Southwest corner of Lot 6; Thence South 15°19'59" West a distance of 570.97 feet to the Point of Beginning; Thence South 09°47'10" East a distance of 43.22 feet; Thence South 80°12'50" West a distance of 29.43 feet; Thence South 09°47'10" East a distance of 49.53 feet; Thence North 80°12'50" East a distance of 0.87 feet; Thence South 09°47'10" East a distance of 102.86 feet; Thence North 80°16'20" East a distance of 10.25 feet; Thence South 09°43'40" East a distance of 47.58 feet; Thence North 80°16'20" East a distance of 0.56 feet; Thence South 09°43'40" East a distance of 22.45 feet; Thence South 73°08'49" West a distance of 45.64 feet; Thence North 16°51'12" West a distance of 3.33 feet; Thence North 03°46'09" East a distance of 20.96 feet; Thence North 09°43'40" West a distance of 77.00 feet; Thence North 80°16'43" East a distance of 19.50 feet; Thence North 09°47'10" West a distance of 77.56 feet; Thence South 80°12'50" West a distance of 75.87 feet; Thence North 09°47'10" West a distance of 24.28 feet; Thence South 80°12'50" West a distance of

59

5.33 feet; Thence North 09°47'10" West a distance of 7.83 feet; Thence South 80°12'50" West a distance of 0.67 feet; Thence North 09°47'10" West a distance of 12.00 feet; Thence North 80°12'50" East a distance of 0.67 feet; Thence North 09°47'10" West a distance of 8.33 feet; Thence North 80°12'50" East a distance of 0.67 feet; Thence North 09°47'10" West a distance of 21.92 feet; Thence South 80°12'50" West a distance of 0.67 feet; Thence North 09°47'10" West a distance of 2.83 feet; Thence North 80°12'50" East a distance of 91.00 feet; Thence North 09°47'09" West a distance of 16.37 feet; Thence South 87°20'22" West a distance of 4.54 feet; Thence North 02°39'35" West a distance of 2.89 feet; Thence North 87°27'35" East a distance of 33.65 feet to the said Point of Beginning, Containing 0.29 acres of land, more or less.

4) (Area below Retail space in Building 3) That portion of Lot 1 of Branson Landing, a subdivision recorded in Plat Book /Slide G, at Pages 767 through 770 of the Taney County Recorder's Office, said parcel being situated in the Southeast Quarter (SE1/4) of the Southwest Quarter (SW1/4) of Section 33, Township 23 North, Range 21 West of the fifth principal meridian, in the City of Branson, Taney County, Missouri, laying between the elevations of 709.61 and 720.02 based on NAVD 1988, Being more particularly described as follows:

Commencing at the Southeast corner of Lot 6 of said Branson Landing; Thence South 79°20'35" West a distance of 103.60 feet to the Southwest corner of Lot 6; Thence South 15°19'58" West a distance of 570.97 feet; Thence South 09°47'10" East a distance of 43.22 feet to the Point of Beginning; Thence continuing South 09°47'10" East a distance of 49.53 feet; Thence South 80°12'50" West a distance of 29.43 feet; Thence North 09°47'10" West a distance of 49.53 feet; Thence North 80°12'50" East a distance of 29.43 feet to the said Point of Beginning, Containing 0.09 acres of land, more or less, 1,457 square feet of land, more or less.

5) (Boutique Units Above Second Floor of Building 3) That portion of Lot 1 of Branson Landing, a subdivision recorded in Plat Book /Slide G, at Pages 767 through 770 of the Taney County Recorder's Office, said parcel being situated in the Southeast Quarter (SE1/4) of the Southwest Quarter (SW1/4) of Section 33, Township 23 North, Range 21 West of the fifth principal meridian, in the City of Branson, Taney County, Missouri, laying between the elevations of 751.77 and 782.95, based on NAVD 1988, Being more particularly described as follows:

Commencing at the Southeast corner of Lot 6 of said Branson Landing; Thence South 79°20'35" West a distance of 103.60 feet to the Southwest corner of Lot 6; Thence South 15°24'47" West a distance of 439.54 feet to the Point of Beginning; Thence South 02°39'35" East a distance of 13.00 feet; Thence North 87°20'25" East a distance of 5.12 feet; Thence South 02°39'38" East a distance of 16.00 feet; Thence South 87°20'25" West a distance of 5.12 feet; Thence South 02°39'35" East a distance of 27.00 feet; Thence North 87°20'25" East a distance of 5.12 feet; Thence South 02°39'38" East a distance of 16.00 feet; Thence South 87°20'25" West a distance of 5.12 feet; Thence South 02°39'35" East a distance of 24.83 feet; Thence North 87°20'25" East a distance of

5.12 feet; Thence South 02°39'38" East a distance of 31.19 feet;
Thence South 87°20'22" West a distance of 16.14 feet; Thence
South 09°47'10" East a distance of 88.09 feet; Thence South
88°12'50" West a distance of 31.33 feet; Thence North 09°47'10"
West a distance of 0.67 feet; Thence South 80°12'50" West a
distance of 112.00 feet; Thence North 09°47'10" West a distance
of 25.34 feet; Thence South 80°12'50" West a distance of 5.33
feet; Thence North 09°47'10" West a distance of 7.93 feet; Thence
South 80°12'50" West a distance of 0.67 feet; Thence North
09°47'10" West a distance of 12.00 feet; Thence North 80°12'50"
East a distance of 0.67 feet; Thence North 09°47'10" West a
distance of 7.83 feet; Thence North 80°12'50" East a distance of
5.33 feet; Thence North 09°47'10" West a distance of 20.87 feet;
Thence North 80°12'50" East a distance of 28.92 feet; Thence
North 09°47'10" West a distance of 4.59 feet; Thence North
80°12'50" East a distance of 15.13 feet; Thence South 09°47'10"
East a distance of 4.83 feet; Thence North 80°12'50" East a
distance of 13.12 feet; Thence North 09°47'10" West a distance of
4.83 feet; Thence North 80°12'50" East a distance of 28.51 feet;
Thence North 09°47'09" West a distance of 16.37 feet; Thence
South 87°20'22" West a distance of 4.54 feet; Thence North
02°39'33" West a distance of 31.02 feet; Thence North 87°20'25"
East a distance of 4.50 feet; Thence North 02°39'35" West a
distance of 12.00 feet; Thence South 87°20'25" West a distance of
5.17 feet; Thence North 02°39'35" West a distance of 14.67 feet;
Thence North 87°20'25" East a distance of 0.67 feet; Thence North
02°39'35" West a distance of 27.67 feet; Thence South 87°20'25"
West a distance of 0.67 feet; Thence North 02°39'35" West a
distance of 14.67 feet; Thence North 87°20'25" East a distance of
0.67 feet; Thence North 02°39'35" West a distance of 28.50 feet;
Thence North 87°20'25" East a distance of 23.00 feet; Thence
North 02°39'35" West a distance of 4.33 feet; Thence North
87°20'25" East a distance of 19.96 feet; Thence South 02°39'35"
East a distance of 4.83 feet; Thence North 87°20'25" East a
distance of 30.71 feet to the said Point of Beginning, Containing
0.60 acres of land, more or less.

6) (BCW North 1) A part of Lot 1, BRANSON LANDING, a subdivision per
the recorded plat thereof, Plat Book/Slide G, pages 767-770 of the
Taney County Recorder's Office, being more particularly described
as follows:

Commencing at the West Common Corner of Lots 2 and 6 of said
Branson Landing, said point being on the Easterly line of said Lot
1; thence North 17° 51' 25" West along the Easterly line of Lot 1,
124.88 feet, to the POINT OF BEGINNING; thence Southwesterly along
a segment of a curve to the left having an arc length of 143.97
feet (said curve having a chord bearing and distance of South 53°
55' 47" West 142.38 feet and a radius of 423.51 feet); thence
Westerly along a curve to the right having an arc length of 312.42
feet (said curve having a chord bearing and distance of South 59°
35' 10" West 308.69 feet and a radius of 582.00 feet); thence
Southwesterly along a curve to the left having an arc length of
112.34 feet (said curve having a chord bearing and distance of
South 62° 11' 37" West 111.41 feet and a radius of 252.00 feet);
thence South 49° 25' 21" West 52.41 feet; thence North 85° 34' 39"
West 19.45 feet; thence North 40° 34' 39" West 87.00 feet; thence

61

North 49° 25' 21" East 5.00 feet; thence North 40° 34' 39" West 105.18 feet to a point on the Northerly line of said Lot 1, Branson Landing, being a course 10.00 feet Northerly from the Southerly edge of Roark Creek, said Southerly edge being defined as the Ordinary High Water Mark (OHWM) U.S.G.S. elevation of 703.00 as established by the U.S. Army Corps of Engineers; thence Northeasterly along the North line of Lot 1, said line being 10.00 feet Northerly and parallel to said OHWM of Roark Creek to the West Common Corner of Lots 1 and 2, Branson Landing; thence North 89° 06' 53" East along the common line between said Lots 1 and 2, 30.55 feet; thence North 14° 23' 02" East along common line 162.47 feet; thence South 05° 47' 58" East along common line 345.00 feet; thence South 10° 45' 58" East along common line 258.00 feet; thence South 17° 51' 25" East along common line 32.78 feet to the point of beginning; containing 3.75 acres, more or less.

7) (RCW North 2) A part of Lot 1, BRANSON LANDING, a subdivision per the recorded plat thereof, Plat Book/Slide G, pages 767-770 of the Taney County Recorder's Office, being more particularly described as follows:

Beginning at a corner of said Lot 1, being the intersection of the New R/W of Missouri Pacific Railroad and the Easterly R/W of U.S. Business Highway No. 65; thence North 23° 51' 47" West along Easterly R/W 250.40 feet; thence South 85° 20' 18" East along the North line of Lot 1, 107.03 feet; thence Easterly along North line on a spiral curve to the right with a delta of 9.00°, a spiral length of 300.00 feet and a center line of the central circle being a 6.00° curve to the right (said curve having a chord bearing and distance of South 85° 12' 01" East 65.84 feet); thence South 05° 04' 04" West along North line 164.01 feet; thence North 71° 17' 24" East along North line 24.40 feet to a point, being a course 10.00 feet Northerly from the Southerly edge of Roark Creek, said Southerly edge being defined as the Ordinary High Water Mark (OHWM) U.S.G.S. elevation of 703.00 as established by the U.S. Army Corps of Engineers; thence Northeasterly along North line, said line being 10.00 feet Northerly and parallel to said OHWM of Roark Creek, to a point which bears North 47° 49' 27" East 265.19 feet; thence South 40° 34' 39" East 115.98 feet; thence North 49° 25' 21" East 5.00 feet; thence South 40° 34' 39" East 169.47 feet; thence Southerly along a curve to the left having an arc length of 208.64 feet (said curve having a radius of 1335.00 feet); thence south 32° 31' 02" West 50.59 feet to a point on the Westerly line of said Lot 1 and the Easterly R/W of said Missouri Pacific Railroad; thence Northwesterly along a segment of a curve to the left having an arc length of 324.13 feet (said segment having a chord bearing and distance of North 66° 54' 38" West 322.67 feet and having a radius of 984.93 feet) to P.S.C. Sta 9961+21.6 and 30 feet right; thence Westerly along a spiral curve to the left with a delta of 9.00°, a spiral length of 300.00 feet and the center line of the central circle 6.00° to the left (having a chord bearing and distance of North 52° 11' 25" West 291.85 feet) to the point of beginning; containing 2.51 acres, more or less.

8) Those Condominium Units and Parking Units (both as defined in the Declaration) contained in the air space above and below the ground floor level (but not including the ground floor level) of Building

9, known as and being a portion of THE BOARDWALK AT BRANSON LANDING CONDOMINIUM, a condominium created as per the Declaration of the Boardwalk at Branson Landing Condominium as recorded in Book 495, pages 3595-3638, as corrected in Book 495, pages 8477-8483 and amended in Book 499, pages 3020-3026 (collectively, the Declaration), and as platted in Plat Book/Slide I, pages 62-73.

9) Those Condominium Units and Parking Units (both as defined in the Declaration) contained in the air space above and below the ground floor level (but not including the ground floor level) of Building 10, known as and being a part of THE BOARDWALK AT BRANSON LANDING CONDOMINIUM, a condominium created as per the Declaration of the Boardwalk at Branson Landing Condominium as recorded in Book 495, pages 3605-3638, as corrected in Book 495, pages 8477-8483 and amended in Book 499, pages 3020-3026 (collectively, the Declaration), and as platted in Plat Book/Slide I, pages 151-162.

10) Those Condominium Units and Parking Units (both as defined in the Declaration) contained in the air space above and below the ground floor level (but not including the ground floor level) of Building 2, known as and being a part of THE PROMENADE AT BRANSON LANDING CONDOMINIUM, a condominium as created per the Declaration of the Promenade at Branson Landing Condominium as recorded in Book 499, pages 1405-1442 (collectively, the Declaration) and as platted in Plat Book/Slide I, pages 133-139.

11) Those Condominium Units and Parking Units (both as defined in the Declaration) contained in the air space above and below the ground floor level (but not including the ground floor level) of Building 3, known as and being a part of THE PROMENADE AT BRANSON LANDING CONDOMINIUM, a condominium created as per the Declaration of the Promenade at Branson Landing Condominium as recorded in Book 499, pages 1405-1442 (collectively, the Declaration) and as platted in Plat Book/Slide I, pages 140-147.

## Northwest Tracts

A part of Lot 1, BRANSON LANDING; a subdivision per the recorded plat thereof, Plat Book/Slide G, pages 767-770 of the Taney County Recorder's Office, being more particularly described as follows:

Commencing at the West Common Corner of Lots 2 and 6 of said Branson Landing, said point being on the Easterly line of said Lot 1; thence North 17° 51' 25" West along the Easterly line of Lot 1, 124.88 feet, to the POINT OF BEGINNING; thence Southwesterly along a segment of a curve to the left having an arc length of 143.97 feet (said curve having a chord bearing and distance of South 53° 56' 47" West 142.38 feet and a radius of 423.51 feet); thence Westerly

along a curve to the right having an arc length of 312.42 feet (said curve having a chord bearing and distance of South 59° 35' 10" West 308.69 feet and a radius of 582.00 feet); thence Southwesterly along a curve to the left having an arc length of 112.34 feet (said curve having a chord bearing and distance of South 62° 11' 37" West 111.41 feet and a radius of 252.00 feet); thence South 49° 25' 21" West 62.41 feet; thence North 85° 34' 39" West 19.45 feet; thence North 40° 34' 39" West 87.00 feet; thence North 49° 25' 21" East 5.00 feet; thence North 40° 34' 39" West 105.18 feet to a point on the Northerly line of said Lot 1, Branson Landing, being a course 10.00 feet Northerly from the Southerly edge of Roark Creek, said Southerly edge being defined as the Ordinary High Water Mark (OHWM) U.S.G.S. elevation of 703.00 as established by the U.S. Army Corps of Engineers; thence Northeasterly along the North line of Lot 1, said line being 10.00 feet Northerly and parallel to said OHWM of Roark Creek to the West Common Corner of Lots 1 and 2, Branson Landing; thence North 89° 06' 53" East along the common line between said Lots 1 and 2, 30.55 feet; thence North 14° 23' 02" East along common line 162.47 feet; thence South 05° 47' 58" East along common line 346.00 feet; thence South 10° 45' 58" East along common line 258.00 feet; thence South 17° 51' 25" East along common line 32.78 feet to the point of beginning; containing 3.75 acres, more or less; which said exception was reserved for lease to HCW North.

64

A part of Lot 1, BRANSON LANDING, a subdivision per the recorded plat thereof, Plat Book/Slide G, pages 767-770 of the Taney County Recorder's Office, being more particularly described as follows:

Beginning at the corner of said Lot 1, being the intersection of the New R/W of Missouri Pacific Railroad and the Easterly R/W of U.S. Business Highway No. 65; thence North 23° 51' 47" West along Easterly R/W 250.40 feet; thence South 85° 20' 18" East along the North line of Lot 1, 107.03 feet; thence Easterly along North line on a spiral curve to the right with a delta of 9.00°, a spiral length of 300.00 feet and a center line of the central circle being a 6.00° curve to the right (said curve having a chord bearing and distance of South 85° 12' 01" East 65.84 feet); thence South 05° 04' 04" West along North line 164.01 feet; thence North 71° 17' 24" East along North line 24.40 feet to a point, being a course 10.00 feet Northerly from the Southerly edge of Roark Creek, said Southerly edge being defined as the Ordinary High Water Mark (OHWM) U.S.G.S. elevation of 703.00 as established by the U.S. Army Corps of Engineers; thence Northeasterly along North line, said line being 10.00 feet Northerly and parallel to said OHWM of Roark Creek, to a point which bears North 47° 49' 27" East 265.19 feet; thence South 40° 34' 39" East 115.98 feet; thence North 49° 25' 21" East 5.00 feet; thence South 40° 34' 39" East 169.47 feet; thence Southerly along a curve to the left having an arc length of 208.64 feet (said curve having a radius of 1335.00 feet); thence south 32° 31' 02" West 50.59 feet to a point on the Westerly line of said Lot 1 and the Easterly R/W of said Missouri Pacific Railroad; thence

Northwesterly along a segment of a curve to the left having an arc length of 324.13 feet (said segment having chord bearing and distance of North 66° 54' 38" West 322.67 feet and having a radius of 984.93 feet) to P.S.C. Sta 9961+21.6 and 30 feet right; thence Westerly along a spiral curve to the left with a delta of 9.00°, a spiral length of 300.00 feet and the center line of the central circle 6.00° to the left (having a chord bearing and distance of North 82° 11' 25" West 291.85 feet) to the point of beginning; containing 2.51 acres, more or less.

## Arvest's Judgment - Northwest Tracts

A part of Lot 1, BRANSON LANDING; a subdivision per the recorded plat thereof, Plat Book/Slide G, pages 767-770 of the Taney County Recorder's Office, being more particularly described as follows:

Commencing at the West Common Corner of Lots 2 and 6 of said Branson Landing, said point being on the Easterly line of said Lot 1; thence North 17° 51' 25" West along the Easterly line of Lot 1, 124.88 feet, to the POINT OF BEGINNING; thence Southwesterly along a segment of a curve to the left having an arc length of 143.97 feet (said curve having a chord bearing and distance of South 53° 56' 47" West 142.38 feet and a radius of 423.51 feet); thence Westerly along a curve to the right having an arc length of 312.42 feet (said curve having a chord bearing and distance of South 59° 35' 10" West 308.69 feet and a radius of 582.00 feet); thence Southwesterly along a curve to the left having an arc length of 112.34 feet (said curve having a chord bearing and distance of South 62° 11' 37" West 111.41 feet and a radius of 252.00 feet); thence South 49° 25' 21" West 62.41 feet; thence North 85° 34' 39" West 19.45 feet; thence North 40° 34' 39" West 87.00 feet; thence North 49° 25' 21" East 5.00 feet; thence North 40° 34' 39" West 105.18 feet to a point on the Northerly line of said Lot 1, Branson Landing, being a course 10.00 feet Northerly from the Southerly edge of Roark Creek, said Southerly edge being defined as the Ordinary High Water Mark (OHWM) U.S.G.S. elevation of 703.00 as established by the U.S. Army Corps of Engineers; thence Northeasterly along the North line of Lot 1, said line being 10.00 feet Northerly and parallel to said OHWM of Roark Creek to the West Common Corner of Lots 1 and 2, Branson Landing; thence North 89° 06' 53" East along the common line between said Lots 1 and 2, 30.55 feet; thence North 14° 23' 02" East along common line 162.47 feet; thence South 05° 47' 58" East along common line 346.00 feet; thence South 10° 45' 58" East along common line 258.00 feet; thence South 17° 51' 25" East along common line 32.78 feet to the point of beginning; containing 3.75 acres, more or less; which said exception was reserved for lease to HCW North.

---

A part of Lot 1, BRANSON LANDING, a subdivision per the recorded plat thereof, Plat Book/Slide G, pages 767-770 of the Taney County Recorder's Office, being more particularly described as follows:

Beginning at the corner of said Lot 1, being the intersection of the New R/W of Missouri Pacific Railroad and the Easterly R/W of U.S. Business Highway No. 65; thence North 23° 51' 47" West along Easterly R/W 250.40 feet; thence South 85° 20' 18" East along the North line of Lot 1, 107.03 feet; thence Easterly along North line on a spiral curve to the right with a delta of 9.00°, a spiral length of 300.00 feet and a center line of the central circle being a 6.00° curve to the right (said curve having a chord bearing and distance of South 85° 12' 01" East 65.84 feet); thence South 05° 04' 04" West along North line 164.01 feet; thence North 71° 17' 24" East along North line 24.40 feet to a point, being a course 10.00 feet Northerly from the Southerly edge of Roark Creek, said Southerly edge being defined as the Ordinary High Water Mark (OHWM) U.S.G.S.

elevation of 703.00 as established by the U.S. Army Corps of Engineers; thence Northeasterly along North line, said line being 10.00 feet Northerly and parallel to said OHWM of Roark Creek, to a point which bears North 47° 49' 27" East 265.19 feet; thence South 40° 34' 39" East 115.98 feet; thence North 49° 25' 21" East 5.00 feet; thence South 40° 34' 39" East 169.47 feet; thence Southerly along a curve to the left having an arc length of 208.64 feet (said curve having a radius of 1335.00 feet); thence south 32° 31' 02" West 50.59 feet to a point on the Westerly line of said Lot 1 and the Easterly R/W of said Missouri Pacific Railroad; thence Northwesterly along a segment of a curve to the left having an arc length of 324.13 feet (said segment having chord bearing and distance of North 66° 54' 38" West 322.67 feet and having a radius of 984.93 feet) to P.S.C. Sta 9961+21.6 and 30 feet right; thence Westerly along a spiral curve to the left with a delta of 9.00°, a spiral length of 300.00 feet and the center line of the central circle 6.00° to the left (having a chord bearing and distance of North 82° 11' 25" West 291.85 feet) to the point of beginning; containing 2.51 acres, more or less.

67

## U.S. Bank's Judgment - Retail North - Exhibit A

EXHIBIT A

All of that part of the following property that is situated within the Northeast Quarter of the Southwest Quarter of Section 33, Township 23 North, Range 21 West, in Taney County, Missouri:

Lots 1, 3 and 4, BRANSON LANDING, a subdivision as per the recorded plat thereof, Plat Book/Slide G, pages 767-770, of the Taney County Recorder's Office, City of Branson, Taney County, Missouri,

ALSO, a part of Lot 6, BRANSON LANDING, a subdivision as per the recorded plat thereof, Plat Book/Slide G, pages 767-770, of the Taney County Recorder's Office, City of Branson, Taney County, Missouri, being more particularly described as follows:

1) (B-1) Beginning at the Southwest corner of said Lot 6; thence North 26° 46' 18" West along the Westerly line of said Lot 6, 203.35 feet; thence North 74° 49' 13" East 23.01 feet; thence South 15° 10' 47" East 105.00 feet; thence South 60° 10' 47" East 84.85 feet; thence South 15° 10' 47" East 38.20 feet to a point on the South line of said Lot 6; thence South 80° 13' 42" West along South line 42.33 feet to the point of beginning; containing 0.10 acres, more or less; and

2) (B-2) Commencing at the Southwest corner of said Lot 6; thence North 26° 46' 18" West along the Westerly line of said Lot 6, 231.69 feet to the POINT OF BEGINNING; thence continuing North 26° 46' 18" West along Westerly line 146.91 feet; thence North 20° 45' 18" West along Westerly line 93.53 feet; thence North 67° 24' 07" East 61.25 feet; thence South 22° 35' 53" East 240.00 feet; thence South 67° 24' 07" West 53.56 feet to the point of beginning, containing 0.33 acres, more or less.

Together with those appurtenant easements as set forth in the Branson Landing Agreement Regarding Ratification, Confirmation and Acknowledgement, as recorded in Book 500, pages 2591-2601.

Together with those appurtenant easements as set forth in the Amendment, Severance and Ratification of Master Lease Agreement dated November 1, 2006, as recorded in Book 504, pages 1560.

LESS AND EXCEPT THE FOLLOWING TRACTS:

1) (Boutique Hotel Building 3) That portion of Lot 1 of Branson Landing, a subdivision recorded in Plat Book /Slide G, at Pages 767 through 770 of the Taney County Recorder's Office, said parcel being situated in the Southeast Quarter (SE1/4) of the Southwest Quarter (SW1/4) of Section 33, Township 23 North, Range 21 West of the fifth principal meridian, in the City of Branson, Taney County, Missouri, laying between the elevations of 718.90 and 743.65, based on NAVD 1988, Being more particularly described as follows:

Commencing at the Southeast corner of Lot 6 of said Branson Landing; Thence South 79°20'35" West a distance of 103.60 feet to the Southwest corner of Lot 6; Thence South 28°32'51" West a distance of 386.41 feet to the Point of Beginning; Thence South 02°39'39" East a distance of 31.86 feet; Thence North 87°20'21" East a distance of 6.69 feet; Thence South 02°39'54" East a distance of 1.94 feet; Thence North 87°20'22" East a distance of 5.00 feet; Thence South 02°39'42" East a distance of 13.58 feet; Thence South 87°20'22" West a distance of 4.50 feet; Thence North 02°39'42" West a distance of 2.00 feet; Thence South 87°20'22" West a distance of 7.92 feet; Thence South 02°39'38" East a distance of 2.00 feet; Thence South 87°20'22" West a distance of 9.75 feet; Thence South

02°39'38" East a distance of 168.00 feet; Thence North 87°20'22" East a distance of 5.21 feet; Thence South 09°47'09" East a distance of 16.37 feet; Thence South 80°12'50" West a distance of 90.33 feet; Thence North 09°47'10" West a distance of 36.94 feet; Thence North 80°12'50" East a distance of 6.05 feet; Thence North 09°47'10" West a distance of 14.73 feet; Thence North 80°12'50" East a distance of 38.08 feet; Thence North 02°39'38" West a distance of 7.29 feet; Thence North 80°12'50" East a distance of 6.19 feet; Thence North 02°39'38" West a distance of 14.86 feet; Thence South 87°20'22" West a distance of 51.76 feet; Thence North 02°39'38" West a distance of 38.79 feet; Thence North 87°20'22" East a distance of 51.76 feet; Thence North 02°39'38" West a distance of 15.11 feet; Thence North 85°32'09" West a distance of 6.19 feet; Thence North 02°39'39" West a distance of 7.73 feet; Thence North 85°32'09" West a distance of 42.58 feet; Thence North 10°03'02" West a distance of 54.12 feet; Thence South 79°56'58" West a distance of 2.67 feet; Thence North 09°47'10" West a distance of 12.83 feet; Thence North 80°12'50" East a distance of 10.92 feet; Thence North 09°47'10" West a distance of 7.21 feet; Thence North 73°52'12" East a distance of 87.55 feet; Thence North 02°39'39" West a distance of 0.50 feet; Thence North 87°20'21" East a distance of 13.87 feet to the said Point of Beginning, Containing 0.43 acres of land, more or less.

2) (Boutique Hotel Below Condominium Units Building 3) That portion of Lot 1 of Branson Landing, a subdivision recorded in Plat Book /Slide G, at Pages 767 through 770 of the Taney County Recorder's Office, said parcel being situated in the Southeast Quarter (SE1/4) of the Southwest Quarter (SW1/4) of Section 33, Township 23 North, Range 21 West of the fifth principal meridian, in the City of Branson, Taney County, Missouri, laying between the elevations of 723.65 and 739.53, based on NAVD 1988, Being more particularly described as follows:

Commencing at the Southeast corner of Lot 6 of said Branson Landing; Thence South 79°20'35" West a distance of 103.60 feet to the Southwest corner of Lot 6; Thence South 26°28'59" West a distance of 432.64 feet to the Point of Beginning; Thence North 87°20'22" East a distance of 9.75 feet; Thence South 02°39'38" East a distance of 158.46 feet; Thence North 87°20'25" East a distance of 12.26 feet; Thence South 09°41'54" East a distance of 6.72 feet; Thence North 87°35'35" East a distance of 11.48 feet; Thence South 09°47'10" East a distance of 67.42 feet; Thence South 80°12'50" West a distance of 29.43 feet; Thence South 09°47'10" East a distance of 26.40 feet; Thence South 80°12'50" West a distance of 85.48 feet; Thence North 09°47'10" West a distance of 25.34 feet; Thence South 80°12'50" West a distance of 5.33 feet; Thence North 09°47'10" West a distance of 7.83 feet; Thence South 80°12'50" West a distance of 0.67 feet; Thence North 09°47'10" West a distance of 12.00 feet; Thence North 80°12'50" East a distance of 0.67 feet; Thence North 09°47'10" West a distance of 33.08 feet; Thence North 80°12'50" East a distance of 91.00 feet; Thence North 09°47'09" West a distance of 16.37 feet; Thence South 87°20'22" West a distance of 5.21 feet; Thence North 02°39'38" West a distance of 168.00 feet to the said Point of Beginning, Containing 0.25 acres of land, more or less;

AND, That portion of Lot 1 of Branson Landing, a subdivision recorded in Plat Book /Slide G, at Pages 767 through 770 of the Taney County Recorder's Office, said parcel being situated in the Southeast Quarter (SE1/4) of the Southwest Quarter (SW1/4) of Section 33, Township 23 North, Range 21 West of the fifth principal meridian, in the City of Branson, Taney County, Missouri, laying between the elevations of 720.54 and 739.53, based on NAVD 1988, Being more particularly described as follows:

commencing at the Southeast corner of Lot 6 of said Branson Landing; Thence South 79°20'35" West a distance of 103.60 feet to the Southwest corner of Lot 6; Thence South 23°51'18" West a distance of 422.29 feet to the Point of Beginning; Thence South 02°39'42" East a distance of

69

34.97 feet; Thence North 87°20'18" East a distance of 12.50 feet; Thence South 02°39'42" East a distance of 20.00 feet; Thence South 87°20'18" West a distance of 11.17 feet; Thence North 02°39'42" West a distance of 15.50 feet; Thence South 87°20'25" West a distance of 5.83 feet; Thence North 02°39'42" West a distance of 39.48 feet; Thence North 87°20'22" East a distance of 4.50 feet to the said Point of Beginning, Containing 0.01 acres of land, more or less.

3) (Lower Level Boutique Hotel Property Buildings 2 and 3) That portion of Lot 1 of Branson Landing, a subdivision recorded in Plat Book /Slide G, at Pages 767 through 770 of the Taney County Recorder's Office, said parcel being situated in the Southeast Quarter (SE1/4) of the Southwest Quarter (SW1/4) of Section 33, Township 23 North, Range 21 West of the fifth principal meridian, in the City of Branson, Taney County, Missouri, laying between the elevations of 709.61 and 723.11 based on NAVD 1988, Being more particularly described as follows:

Commencing at the Southeast corner of Lot 6 of said Branson Landing; Thence South 79°20'35" West a distance of 103.60 feet to the Southwest corner of Lot 6; Thence South 15°19'58" West a distance of 570.97 feet to the Point of Beginning; Thence South 09°47'10" East a distance of 43.22 feet; Thence South 80°12'50" West a distance of 29.43 feet; Thence South 09°47'10" East a distance of 49.53 feet; Thence North 80°12'50" East a distance of 0.87 feet; Thence South 09°47'10" East a distance of 102.86 feet; Thence North 80°16'20" East a distance of 10.25 feet; Thence South 09°43'40" East a distance of 47.58 feet; Thence North 80°16'20" East a distance of 0.56 feet; Thence South 09°43'40" East a distance of 22.45 feet; Thence South 73°08'49" West a distance of 45.64 feet; Thence North 16°51'12" West a distance of 3.33 feet; Thence North 03°46'09" East a distance of 20.96 feet; Thence North 09°43'40" West a distance of 77.00 feet; Thence North 80°16'43" East a distance of 19.50 feet; Thence North 09°47'10" West a distance of 77.86 feet; Thence South 80°12'50" West a distance of 75.87 feet; Thence North 09°47'10" West a distance of 24.28 feet; Thence South 80°12'50" West a distance of 5.33 feet; Thence North 09°47'10" West a distance of 7.83 feet; Thence South 80°12'50" West a distance of 0.67 feet; Thence North 09°47'10" West a distance of 12.00 feet; Thence North 80°12'50" East a distance of 0.67 feet; Thence North 09°47'10" West a distance of 8.33 feet; Thence North 80°12'50" East a distance of 0.67 feet; Thence North 09°47'10" West a distance of 21.92 feet; Thence South 80°12'50" West a distance of 0.67 feet; Thence North 09°47'10" West a distance of 2.83 feet; Thence North 80°12'50" East a distance of 91.00 feet; Thence North 09°47'09" West a distance of 16.37 feet; Thence South 87°20'22" West a distance of 4.54 feet; Thence North 02°39'35" West a distance of 2.89 feet; Thence North 87°27'35" East a distance of 33.65 feet to the said Point of Beginning, Containing 0.29 acres of land, more or less.

4) (Area below Retail space in Building 3) That portion of Lot 1 of Branson Landing, a subdivision recorded in Plat Book /Slide G, at Pages 767 through 770 of the Taney County Recorder's Office, said parcel being situated in the Southeast Quarter (SE1/4) of the Southwest Quarter (SW1/4) of Section 33, Township 23 North, Range 21 West of the fifth principal meridian, in the City of Branson, Taney County, Missouri, laying between the elevations of 709.61 and 720.02 based on NAVD 1988, Being more particularly described as follows:

Commencing at the Southeast corner of Lot 6 of said Branson Landing; Thence South 79°20'35" West a distance of 103.60 feet to the Southwest corner of Lot 6; Thence South 15°19'58" West a distance of 570.97 feet; Thence South 09°47'10" East a distance of 43.22 feet to the Point of Beginning; Thence continuing South 09°47'10" East a distance of 49.53 feet; Thence South 80°12'50" West a distance of 29.43 feet; Thence North 09°47'10" West a distance of 49.53 feet; Thence North 80°12'50" East a distance of 29.43 feet to the said

70

Point of Beginning, Containing 0.09 acres of land, more or less, 1,457 square feet of land, more or less.

5) (Boutique Units Above Second Floor of Building 3) That portion of Lot 1 of Branson Landing, a subdivision recorded in Plat Book /Slide G, at Pages 767 through 770 of the Taney County Recorder's Office, said parcel being situated in the Southeast Quarter (SE1/4) of the Southwest Quarter (SW1/4) of Section 33, Township 23 North, Range 21 West of the fifth principal meridian, in the City of Branson, Taney County, Missouri, laying between the elevations of 751.77 and 782.95, based on NAVD 1988. Being more particularly described as follows:

Commencing at the Southeast corner of Lot 6 of said Branson Landing; Thence South 79°20'35" West a distance of 103.60 feet to the Southwest corner of Lot 6; Thence South 15°24'47" West a distance of 439.54 feet to the Point of Beginning; Thence South 02°39'35" East a distance of 13.00 feet; Thence North 87°20'25" East a distance of 5.12 feet; Thence South 02°39'38" East a distance of 16.00 feet; Thence South 87°20'25" West a distance of 5.12 feet; Thence South 02°39'35" East a distance of 27.00 feet; Thence North 87°20'25" East a distance of 5.12 feet; Thence South 02°39'38" East a distance of 16.00 feet; Thence South 87°20'25" West a distance of 5.12 feet; Thence South 02°39'35" East a distance of 24.83 feet; Thence North 87°20'25" East a distance of 5.12 feet; Thence South 02°39'38" East a distance of 31.19 feet; Thence South 87°20'22" West a distance of 16.14 feet; Thence South 09°47'10" East a distance of 88.09 feet; Thence South 80°12'50" West a distance of 31.33 feet; Thence North 09°47'10" West a distance of 0.67 feet; Thence South 80°12'50" West a distance of 112.00 feet; Thence North 09°47'10" West a distance of 25.34 feet; Thence South 80°12'50" West a distance of 5.33 feet; Thence North 09°47'10" West a distance of 7.83 feet; Thence South 80°12'50" West a distance of 0.67 feet; Thence North 09°47'10" West a distance of 12.00 feet; Thence North 80°12'50" East a distance of 0.67 feet; Thence North 09°47'10" West a distance of 7.83 feet; Thence North 80°12'50" East a distance of 5.33 feet; Thence North 09°47'10" West a distance of 20.67 feet; Thence North 80°12'50" East a distance of 28.92 feet; Thence North 09°47'10" West a distance of 4.59 feet; Thence North 80°12'50" East a distance of 15.13 feet; Thence South 09°47'10" East a distance of 4.83 feet; Thence North 80°12'50" East a distance of 13.12 feet; Thence North 09°47'10" West a distance of 4.83 feet; Thence North 80°12'50" East a distance of 28.51 feet; Thence North 09°47'09" West a distance of 16.37 feet; Thence South 87°20'22" West a distance of 4.54 feet; Thence North 02°39'35" West a distance of 31.02 feet; Thence North 87°20'25" East a distance of 4.50 feet; Thence North 02°39'35" West a distance of 12.00 feet; Thence South 87°20'25" West a distance of 5.17 feet; Thence North 02°39'35" West a distance of 14.67 feet; Thence North 87°20'25" East a distance of 0.67 feet; Thence North 02°39'35" West a distance of 27.67 feet; Thence South 87°20'25" West a distance of 0.67 feet; Thence North 02°39'35" West a distance of 14.67 feet; Thence North 87°20'25" East a distance of 0.67 feet; Thence North 02°39'35" West a distance of 28.50 feet; Thence North 87°20'25" East a distance of 23.00 feet; Thence North 02°39'35" West a distance of 4.33 feet; Thence North 87°20'25" East a distance of 19.96 feet; Thence South 02°39'35" East a distance of 4.83 feet; Thence North 87°20'25" East a distance of 30.71 feet to the said Point of Beginning, Containing 0.50 acres of land, more or less.

6) (HCW North 1) A part of Lot 1, BRANSON LANDING, a subdivision per the recorded plat thereof, Plat Book/Slide G, pages 767-770 of the Taney County Recorder's Office, being more particularly described as follows:

Commencing at the West Common Corner of Lots 2 and 6 of said Branson Landing, said point being on the Easterly line of said Lot 1; thence North 17° 51' 25" West along the

71

Easterly line of Lot 1, 124.88 feet, to the POINT OF BEGINNING; thence Southwesterly along a segment of a curve to the left having an arc length of 143.97 feet (said curve having a chord bearing and distance of South 53° 56' 47" West 142.38 feet and a radius of 423.31 feet); thence Westerly along a curve to the right having an arc length of 312.42 feet (said curve having a chord bearing and distance of South 59° 35' 10" West 308.69 feet and a radius of 582.00 feet); thence Southwesterly along a curve to the left having an arc length of 112.34 feet (said curve having a chord bearing and distance of South 62° 11' 37" West 111.41 feet and a radius of 252.00 feet); thence South 49° 25' 21" West 62.41 feet; thence North 85° 34' 39" west 19.45 feet; thence North 40° 34' 39" West 87.00 feet; thence North 49° 25' 21" East 5.00 feet; thence North 40° 34' 39" West 105.18 feet to a point on the Northerly line of said Lot 1, Branson Landing, being a course 10.00 feet Northerly from the Southerly edge of Roark Creek, said Southerly edge being defined as the Ordinary High Water Mark (OHWM) U.S.G.S. elevation of 703.00 as established by the U.S. Army Corps of Engineers; thence Northeasterly along the North line of Lot 1, said line being 10.00 feet Northerly and parallel to said OHWM of Roark Creek to the West Common Corner of Lots 1 and 2, Branson Landing; thence North 89° 06' 53" East along the common line between said Lots 1 and 2, 30.55 feet; thence North 14° 23' 02" East along common line 162.47 feet; thence South 05° 47' 58" East along common line 346.00 feet; thence South 10° 45' 58" East along common line 258.00 feet; thence South 17° 51' 25" East along common line 32.78 feet to the point of beginning; containing 3.75 acres, more or less.

7) (HCW North 2) A part of Lot 1, BRANSON LANDING, a subdivision per the recorded plat thereof, Plat Book/Slide G, pages 767-770 of the Taney County Recorder's Office, being more particularly described as follows;

Beginning at a corner of said Lot 1, being the intersection of the New R/W of Missouri Pacific Railroad and the Easterly R/W of U.S. Business Highway No. 65; thence North 23° 51' 47" West along Easterly R/W 250.40 feet; thence South 85° 20' 18" East along the North line of Lot 1, 107.03 feet; thence Easterly along North line on a spiral curve to the right with a delta of 9.00°, a spiral length of 300.00 feet and a center line of the central circle being a 6.00° curve to the right (said curve having a chord bearing and distance of South 85° 12' 01" East 65.84 feet); thence South 05° 04' 04" West along North line 164.01 feet; thence North 71° 17' 24" East along North line 24.40 feet to a point, being a course 10.00 feet Northerly from the Southerly edge of Roark Creek, said Southerly edge being defined as the Ordinary High Water Mark (OHWM) U.S.G.S. elevation of 703.00 as established by the U.S. Army Corps of Engineers; thence Northeasterly along North line, said line being 10.00 feet Northerly and parallel to said OHWM of Roark Creek, to a point which bears North 47° 49' 27", East 265.19 feet; thence South 40° 34' 39" East 115.98 feet; thence North 49° 25' 21" East 5.00 feet; thence South 40° 34' 39" East 169.47 feet; thence Southerly along a curve to the left having an arc length of 208.64 feet (said curve having a radius of 1335.00 feet); thence South 32° 31' 02" West 50.59 feet to a point on the Westerly line of said Lot 1 and the Easterly R/W of said Missouri Pacific Railroad; thence Northwesterly along a segment of a curve to the left having an arc length of 324.13 feet (said segment having a chord bearing and distance of North 66° 54' 38" West 322.67 feet and having a radius of 984.93 feet) to P.S.C. Sta 9961+21.6 and 30 feet right; thence Westerly along a spiral curve to the left with a delta of 9.00°, a spiral length of 300.00 feet and the center line of the central circle 6.00° to the left (having a chord bearing and distance of North 82° 11' 25" West 291.85 feet) to the point of beginning; containing 2.51 acres, more or less.

8) Those Condominium Units and Parking Units (both as defined in the Declaration) contained in the air space above and below the ground floor level (but not including the ground floor level) of

Building 9, known as and being a portion of THE BOARDWALK AT BRANSON LANDING CONDOMINIUM, a condominium created as per the Declaration of the Boardwalk at Branson Landing Condominium as recorded in Book 495, pages 3605-3638, as corrected in Book 495, pages 8477-8483 and amended in Book 499, pages 3020-3026 (collectively, the Declaration), and as platted in Plat Book/Slide L, pages 62-73.

9) Those Condominium Units and Parking Units (both as defined in the Declaration) contained in the air space above and below the ground floor level (but not including the ground floor level) of Building 10, known as and being a part of THE BOARDWALK AT BRANSON LANDING CONDOMINIUM, a condominium created as per the Declaration of the Boardwalk at Branson Landing Condominium as recorded in Book 495, pages 3605-3638, as corrected in Book 495, pages 8477-8483 and amended in Book 499, pages 3020-3026 (collectively, the Declaration), and as platted in Plat Book/Slide L, pages 151-162.

10) Those Condominium Units and Parking Units (both as defined in the Declaration) contained in the air space above and below the ground floor level (but not including the ground floor level) of Building 2, known as and being a part of THE PROMENADE AT BRANSON LANDING CONDOMINIUM, a condominium as created per the Declaration of the Promenade at Branson Landing Condominium as recorded in Book 499, pages 1405-1442 (collectively, the Declaration) and as platted in Plat Book/Slide L, pages 133-139.

11) Those Condominium Units and Parking Units (both as defined in the Declaration) contained in the air space above and below the ground floor level (but not including the ground floor level) of Building 3, known as and being a part of THE PROMENADE AT BRANSON LANDING CONDOMINIUM, a condominium created as per the Declaration of the Promenade at Branson Landing Condominium as recorded in Book 499, pages 1405-1442 (collectively, the Declaration) and as platted in Plat Book/Slide I, pages 140-147.

73

## U.S. Bank's Judgment - Retail North - Exhibit B



## Branson's Judgment - Eastern Peninsula

All that part of the Southeast quarter of the Northwest quarter and of the Northeast quarter of the Southwest quarter of Section Thirty-three, (33), Twp 23 North, Range 21 West described as follows: Beginning at a point on the left bank of White River in said NE ¼ of the SW ¼, Said point being 250 ft. South of the North line of said NE ¼ of SW ¼; thence west to a point on the high bench, 268 feet distance from the high bank of White River; thence on azimuths from magnetic North, North 13 degrees 48 minutes West 258 feet; thence North 8 degrees 50 minutes east, 346 feet, thence South 11 degrees 21 minutes West to an intersection with the east bank of Roar Creek; then along the east and South banks of Roark Creek to the confluence with White River; thence following the meander of said River bank to the point of beginning excepting a strip 80 feet wide along the said river bank in said northeast ¼ of the southwest ¼ not belonging to the estate of said Henry H. Compton Deceased. Containing 3.36 acres more or less, the said parties of the first part retaining possession of so much of such premises not actually to be submerged by the lake water of a dam being constructed in White River, as may be necessary according to the rise and fall of said lake water for the maintenance of and access to a landing for their ferry along the back water in Roark Creek the party of the second party hereby consenting to the like maintenance of a ferry landing in the opposite bank of White River in the Southeast fr'l ¼ of the N.W. ¼ of said Section 33, in so far as said party of the second part's interest in and to said SE fr'l ¼ of the N.W. ¼ may be concerned.

## Branson's Judgment - Western Peninsula

A tract of land being a part of the Southeast Quarter of the Northwest Quarter and a part of the Northeast Quarter of the Southwest Quarter of Section 33, Township 23 North, Range 21 West, being more particularly described as follows: Beginning at the Northeast corner of Park Addition to the City of Branson, Missouri; thence North 2°19' West to the southerly bank of Roark Creek; thence in a southerly direction with the easterly and southerly bank of said Roark Creek to the northerly line of said Park Addition; thence easterly to the Point of Beginning, all bearings being referenced to the centerline of Sycamore Street as being due North and South.

## Branson's Judgment - Park Addition

All of Blocks 3, 4 and 5 of Park Addition, formerly a subdivision in the City of Branson, Taney County, Missouri;

## Branson's Judgment - Branson Town

Beginning at a point on the left bank, descending of White River, where the Quarter Section line of Section 33, Township 23, Range 21, running east and west, intersects said bank, more particularly marked by two Sycamore trees, bearing three vertical axe marks; thence West 80 feet to a point; thence South 250 feet to a point, thence West 188 feet to an iron stake; thence South 17°42' East a distance of 360.4 feet to an iron stake; thence South 21°29'

East a distance of 377.5 feet to an iron stake; thence South 27°40 East a distance of 378.6 feet to an iron stake; thence North 79°30' East a distance of 85.3 feet to an iron stake on the left bank descending of White River; thence upon the same course North 79°30' East a distance of 10 feet to the edge of left bank of White River descending; thence along said bank with the meanderings of White River to the Point of Beginning. All lying in Section 33, Township 23, Range 21, in Taney County, Missouri containing 5.75 acres more or less.